UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM D. SMITH,

     Plaintiff,

v.

MELANY GAVULIC and HURLEY
MEDICAL CENTER,

     Defendants.

Case No. 15-10288
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [28]**

---

Defendant Hurley Medical Center terminated the employment of Plaintiff William Smith, the hospital's general counsel, in January 2015. Hurley and its CEO, Defendant Melany Gavulic, say they terminated Smith because a breakdown in his relationship with Gavulic caused her to no longer be able to trust him or his advice. Smith contends that Hurley really discharged him because he is African American and because he complained about how Gavulic allegedly had discriminated against him. So Smith filed this action under Section 1983, Michigan's Whistleblowers' Protection Act, and Michigan's Elliott-Larsen Civil Rights Act, alleging unlawful employment discrimination and retaliation.

Defendants have moved for summary judgment on all of Smith's claims. (R. 28.) The motion is fully briefed, and the Court heard oral argument on December 28, 2016. On this record, Smith has not shown that Gavulic's stated reasons for termination were pretexts for racial discrimination. Nor has he shown that his complaints against Gavulic amounted to protected speech for purposes of his Section 1983 First Amendment retaliation claim. Finally, Smith has also failed to establish that Gavulic knew of his purportedly protected activity or that such

activity caused his termination for purposes of his state-law retaliation claims. So the Court will grant Defendants' motion.

### I.

### A.

Plaintiff William Smith started working for Defendant Hurley Medical Center in September 1986. (R. 30-2, PID 1007.) He became general counsel in February 1988 and served in that role and as an executive vice president until Hurley fired him on January 13, 2015. (R. 30-2, PID 1007; R. 28-3, PID 649.) Defendant Melany Gavulic is Hurley's CEO, a role she has served in since February 2012. (R. 28-4, PID 651.)

Hurley is a component unit of the city of Flint, Michigan. (R. 28-4, PID 652.) A 15-member Board of Managers governs Hurley. (R. 28-4, PID 652.) As the general counsel, Smith reported both to Gavulic and the Board. (R. 28-5, PID 740.) Only the Board had the ultimate authority to fire Smith. (R. 28-4, PID 652.)

According to Smith, as general counsel, it was important for him to have a good relationship with the CEO and the Board. (R. 30-2, PID 1009.) Gavulic and Smith agree that when she became CEO, the two had a good working relationship. (R. 30-2, PID 1010; 28-5, PID 741.) But that was short-lived. Gavulic, who is White, eventually recommended for the Board to terminate Smith, who is African-American. Smith's case centers on several incidents that he claims strained his relationship with Gavulic and demonstrate her racial animus toward African Americans and her (and the Board's) retaliatory animus toward him.

### B.

The first incident arose in November 2012, when a White father demanded that no Black nurses care for his baby, who was being treated in Hurley's neonatal intensive care unit. An

October 2014 memo that Smith wrote to the Board chair (which will be discussed in further detail below) briefly described the situation as follows:

> November 1, 2012—<u>General Counsel (GC) tells Nursing administration that staff cannot be assigned/re-assigned based on race (NICU matter).</u> (As you recall, a Black NICU nurse had been removed (re-assigned) from caring for a White NICU baby because the father requested that no Black nurses care for his baby). General Counsel was made aware of this (by Dr. Monga and Mary Osika) and told administration that it must stop immediately because assignments cannot be based on race.

(R. 35-4, PID 1564.)

Smith testified that his relationship with Gavulic started to change following that incident. (R. 30-2, PID 1024.) According to Smith, in January 2013, he "was told the Board didn't want me to be present for a discussion that was . . . probably about a retreat that had recently happened with the Board, and for some reason they didn't want me present." (R. 30-2, PID 1024.) But instead of discussing a retreat, the Board decided at that meeting to remove some of Smith's duties by separating corporate compliance functions from the general counsel position. (R. 30-2, PID 1025.)

Hurley has offered several reasons for this decision. For instance, the Board's resolution stated that splitting the duties was "in accordance with Board best practices and [Office of Inspector General] recommendations." (R. 28-6, PID 800.) And according to Gavulic, outside investigators that Smith had previously hired for compliance issues expressed "concerns that [Smith] was biasing investigations by sharing with them his impressions before the investigations started." (R. 28-5, PID 741.)

In response to the Board's decision, in a January 28, 2013 letter, Smith wrote to then-Board chair, Charlotte Edwards, that "the stripping of the Corporate Compliance functions from me by the [B]oard" amounted to a "demotion" and "a termination." (R. 28-8, PID 834.) After a

3

series of heated emails, on February 7, 2013, Edwards determined that Smith had been insubordinate (Smith had instructed Hurley's human resources to remove a juris doctor requirement from a posted compliance position even though his compliance duties had been removed), so the Board placed him on administrative leave. (R. 28-9, PID 839; R. 28-7, PID 808.)

Smith testified that, based on the timing of the events, he believes that his suspension and the removal of his compliance duties were at least indirectly related to the NICU incident—and in particular his advice that race-based nursing assignments had to stop. (R. 30-2, PID 1024–25.)

At the next Board meeting, held on February 27, Edwards gave Smith the opportunity to appear and address his concerns. (R. 28-9, PID 839.) At that meeting, the Board accepted Gavulic's recommendation to reinstate Smith (but with compliance duties remaining separate from his position). (R. 28-4, PID 653–54.)

### C.

The next incident surrounded Gavulic's decision to pass on hiring an African-American candidate for a "staff attorney" who would report to Smith, then the sole in-house attorney at Hurley.

By way of background, in April 2013, shortly after Smith's reinstatement, an anonymous corporate compliance complaint was filed against Smith for purportedly running up expenses by unnecessarily outsourcing his own legal workload, allegedly to secure kickbacks. (*See* R. 35-5, PID 1577; *see also* R. 28-4, PID 657.) In June 2013, the attorney that Hurley hired to investigate the situation issued a report finding no wrongdoing on Smith's part, but the report recommended for Hurley to explore the possibility of hiring another in-house attorney to reduce outside counsel fees. (R. 35-5, PID 1579–80.) So after the investigation, in September 2013, the Board's

4

governance and compliance committee asked Smith and Gavulic to explore whether Hurley could reduce outside counsel fees by, among other things, hiring another attorney. (R. 28-4, PID 658.)

Once Hurley posted this "staff attorney" position, Smith narrowed the applicants to two candidates: Larry Justice and Teri Dennings. (R. 30-2, PID 1041.) Though Smith had typically interviewed and hired his own staff, he and Gavulic agreed that they would each interview the two candidates. (R. 30-2, PID 1040.) Smith pushed for Dennings (who was Black) over Justice (who was White). (R. 30-2, PID 1041, 1045.) Smith thought that Dennings was "uniquely" qualified for the position because of her labor and employment law experience. (R. 35-3, PID 1541.)

But based on her interview with Dennings, Gavulic did not want to hire her. Gavulic had several concerns, which the Court will address in detail later. For now it suffices to say that Gavulic was concerned that Dennings lacked the relevant legal experience and that she asked only one question during the job interview: what the hours would be. (R. 28-5, PID 751.) By contrast, Gavulic liked Justice because he currently held a position of "general counsel," *i.e.*, a position with more responsibility than "staff attorney." (*See* R. 30-3, PID 1161–62.) So Gavulic told Smith that she thought Justice was the better choice. (R. 30-2, PID 1041.)

In the end, the parties' rift over whom to hire became moot: Dennings ultimately withdrew her candidacy (R. 30-2, 1049), Gavulic and Smith passed on Justice too, and Hurley did not hire anyone to fill the position. (R. 28-5, PID 752.)

After Dennings withdrew, Gavulic personally contacted two other prior candidates who had interviewed with Smith but had withdrawn their applications. (R. 28-4, PID 659.) She says she learned that both applicants withdrew "because of Smith's attitude to them in the

5

interviews." (R. 28-4, PID 659.) Smith told Gavulic that he was "shocked" that she contacted these individuals behind his back. (R. 35-3, PID 1534.) And according to Smith, Gavulic got angry whenever they spoke about the Dennings matter. (R. 35-3, PID 1531.)

**D.**

The third incident involves a complaint that Smith filed, which summed up his problems with Gavulic. More specifically, on October 7, 2014, Smith submitted to then-Board chair Carl Bekofske a memo "under Hurley's Executive Employee Relations Policy." (*See* R. 28, PID 377; R. 35, PID 1482; R. 28-10; R. 30-2, PID 1017.) This was the proper procedure for executives to raise employment disputes that could not be resolved by the CEO. (R. 30-2, PID 1017; R. 30-3, PID 1114.)

The memo's "regarding" line reads: "Employment Related Concerns/Executive Employee Relations Policy." (R. 28-10, PID 840.) The memo (addressed to Bekofske) states that its purpose was "to inform you of a pattern of practices (including, but not limited to, undermining and harassing General Counsel, interfering with General Counsel's ability to do his job, isolating General Counsel and, basically removing General Counsel/Risk Manager's job duties/responsibilities) that have been engaged in by the President & CEO . . . for a protracted period of time." (R. 28-10, PID 840.) The 12-page memo goes on to describe the NICU incident, the removal of Smith's compliance duties, Smith's placement on administrative leave, the compliance complaint filed against him, the investigation's findings, the staff attorney hiring process, and a host of other issues that Smith does not focus on for purposes of this litigation. Toward the end of the memo, and after remarking that he was the only African-American executive at the hospital, Smith wrote, "I am sorry that I have to make this request but I really

6

have no other option in order to, hopefully, rectify the situation, stop this harassing, discriminatory and retaliatory behavior/conduct[.]" (R. 28-10, PID 850.)

Smith acknowledged in his testimony that he had written many drafts of the memo before sending it to Bekofske. (R. 30-2, PID 1081.) As he polished the memo, he removed express references to "racial discrimination." (R. 30-2, PID 1081–82.) For instance, an earlier draft's "regarding" line said "Race Discrimination and retaliation complaint," instead of "Employment Related Concerns/Executive Employee Relations Policy." (R. 28-11, PID 853.) The prior draft also asked to "stop this harassing, *racial* discriminatory and retaliatory behavior/conduct," instead of simply "harassing, discriminatory and retaliatory behavior/conduct." (R. 28-11, PID 862.)

While Smith initially testified that this memo to Bekofske was his sole report of "racial" discrimination (*see* R. 30-2, PID 1011–12, 1047), on his second day of testimony, he claimed that he orally reported his racial discrimination claim to Bekofske when discussing the memo and to the Board in a November 2014 meeting that would ultimately lead to his termination, (R. 30-2, PID 1073, 1076). But Smith never expressly told Gavulic that she had discriminated against him on the basis of race. (R. 30-2, PID 1012.)

Bekofske forwarded Smith's memo to the interim human resources director, Tyree Walker, who met with Smith on October 13, 2014. (R. 29-1, PID 942.) Walker and Smith recall differently whether they discussed racial discrimination specifically. Walker claims that Smith never mentioned anything about race, so Walker understood the complaint to amount to a workplace disagreement. (R. 29-1, PID 943.) But Smith testified that he "probably" discussed racial discrimination with Walker. (R. 30-2, PID 1073.)

Walker met with Gavulic to discuss Smith's concerns on October 15, 2014. But he did not give her a copy of Smith's memo. (R. 29-1, PID 943; R. 35, PID 1483; R. 28, PID 378.) Gavulic never directly saw the memo until after this suit was filed. (R. 28-5, PID 743.) Walker then wrote a report for Bekofske to summarize Smith's concerns. (R. 29-1, PID 944.) Gavulic filled in her responses to some of Smith's concerns and sent the document back to Walker. (R. 28-5, PID 758; R. 35-9.)

Walker concluded that Smith's complaints had no merit. (R. 29-1, PID 943–44.) He made two recommendations: for Gavulic and Smith to keep summaries of their weekly meetings and to amend Hurley's policies to allow employees' requests for outside legal services to be approved by the Department of Legal Services and the CEO. (R. 29-1, PID 944–45.) As for Smith and Gavulic's weekly meetings, Walker also discussed with Gavulic the possibility of having the Board's administrative assistant or Gavulic's secretary sit in to take notes and serve as a witness, as each were already aware of the confidential information discussed during high-level meetings. (R. 29-1, PID 945.)

Walker's recommendations did not work, and Gavulic soon concluded that she could no longer work with Smith and that having someone sit in on meetings with Smith was impractical. (R. 35-8, PID 1593.) According to Gavulic, she came to realize that Smith lacked "institutional credibility," which hurt Hurley's ability to function. (R. 28-4, PID 654.) Additionally, she "found [herself] increasingly acting as a buffer between Mr. Smith and the rest of the senior management team who were losing confidence in him." (R. 28-4, PID 656.) She also noted that she did not have to have anyone sit in and document her one-on-one meetings with other executives, "because I had no concerns any other executives would mischaracterize communications." (R. 28-4, PID 660.) Smith acknowledged in his testimony that needing

8

someone to sit in and monitor their meetings "unquestionably" suggested a relationship problem. (R. 30-2, PID 1063.)

Gavulic sought a special Board meeting on November 20, 2014, at which point she recommended splitting the general counsel's duties into two separate positions: Smith would continue as the general counsel to the Board, but she would hire her own general counsel for "operations." (R. 28-5, PID 746.) In other words, she did not recommend his termination at first. The Board adopted her recommendation. (R. 28-4, PID 662.)

But at the Board's next regularly scheduled meeting a few days later, things changed. After the Board's discussions with Smith at that meeting, the Board concluded that it made no financial or organizational sense to have two general counsels. (R. 28-4, PID 663.) The Board thus asked Gavulic if she would recommend Smith's termination. (*Id.*) With the dual general counsel proposal no longer on the table, Gavulic recommended Smith's termination. (*Id.*)

The Board voted to place Smith on administrative leave. (R. 29-3.) The hope was to reach an amicable resolution by agreeing to a separation package for Smith. (R. 29, PID 874, 885; R. 30-2, PID 1079.) But no resolution was reached, and at a January 2015 meeting, the Board unanimously decided to terminate Smith's employment effective January 13, 2015. (R. 28-3, PID 649.) The Board's resolution read as follows:

> On the recommendation of the Hurley Medical Center CEO and having determined that there are irreconcilable differences between the CEO and the General Counsel that impair the operations of the medical center, it is resolved that the employment of the Medical Center General Counsel, William Smith, is terminated effective January 13, 2015.

(R. 28-3, PID 649.)

Smith testified that he did not believe that anyone on the Board had a retaliatory motive. (R. 30-2, PID 1080.) Rather, he believed that Gavulic had such a motive and "she was directing

the Board and their actions." (R. 30-2, PID 1080.) For her part, Gavulic was not present when Smith claimed racial discrimination before the Board, and she was not aware that Smith had made such a claim until he filed suit—something he admits. (R. 28-4, PID 663; R. 28, PID 382–83; R. 35, PID 1484.) As for the Board itself, then-chair Bekofske testified that Smith's written complaint is what "initiated the proceedings" that culminated in Smith's termination and this lawsuit. (R. 35-15, PID 1629.)

### E.

Smith filed his complaint in this Court on January 23, 2015 and an amended complaint several days later. (R. 1; R. 3.) His amended complaint has five counts. Count I asserts a racial discrimination claim under 42 U.S.C. § 1983 against Gavulic. (R. 3, PID 11.) Counts II and III assert § 1983 First Amendment claims against Gavulic and Hurley. (*Id*., PID 12–13.) Count IV asserts a claim against Gavulic and Hurley under the Michigan Whistleblowers' Protection Act. (*Id*., PID 13–14.) Finally, Count V asserts a retaliation claim against Defendants under Michigan's Elliott-Larsen Civil Rights Act. (*Id*., PID 14.)

### II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must determine whether the evidence presents a sufficient factual disagreement to

require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

On summary judgment, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party, here Smith. *See Matsushita*, 475 U.S. at 587.

### III.

### A.

### 1.

The Court begins with Smith's Section 1983 claim that Gavulic violated his rights under the Constitution's Equal Protection Clause by discriminating against him on the basis of race.[1] Smith asserts this claim only against Gavulic, not Hurley. (R. 3, PID 11.)

As in the Title VII context, a plaintiff can prove a Section 1983 discrimination claim with direct or circumstantial evidence. *See Weberg v. Franks*, 229 F.3d 514, 522–23 (6th Cir. 2000). The Court will apply the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), because Smith relies on circumstantial evidence. *See Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (applying *McDonnell Douglas* to § 1983 discrimination claim).

Accordingly, Smith has an initial burden to establish a *prima facie* case of racial discrimination. *McDonnell Douglas*, 411 U.S at 802. The burden then shifts to Gavulic to

---

[1] The parties do not dispute that Hurley is a public hospital and that a Section 1983 claim is therefore appropriate.

articulate a legitimate, nondiscriminatory reason for terminating him. *See id.* If Gavulic meets her burden, then Smith "must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016).

### 2.

A plaintiff establishes a *prima facie* case by showing "1) he is a member of a protected class; 2) [he] was qualified for the job; 3) he suffered an adverse employment decision; and 4) [he] was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Arendale*, 519 F.3d at 603 (citations omitted).

The parties here dispute the third element: whether Gavulic's mere recommendation to terminate Smith qualifies as an adverse employment action (since she was not the final decision-maker). They rely on competing cases from the First Amendment retaliation context. *Compare Haji v. Columbus City Sch.*, 621 F. App'x 309, 313 (6th Cir. 2015) (holding that a "recommendation to terminate was still an adverse employment action"), *with Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 605 (5th Cir. 2001) (holding that certain defendants could not be liable because they "did not fire [the plaintiff] directly, but merely recommended her termination to the Board, which made the final decision"); *see also Larkett v. Jones*, No. 14-12723, 2015 WL 4878264, at *9 (E.D. Mich. Aug. 14, 2015) ("Darby recommended Plaintiff's termination to Michael Davis, but she was not the ultimate decision maker. The recommendation, standing alone, was . . . not a materially adverse employment action.").

The Court need not resolve this issue. Even if Smith could establish a prima facie case of racial discrimination, as will be discussed, Gavulic has offered a legitimate reason for terminating him, and Smith has not rebutted that with evidence sufficient for a reasonable jury to

12

find that the reason was a pretext for racial discrimination. So the Court will assume, without deciding, that Smith has established a *prima facie* case and will proceed to the pretext stage. *See Frizzell v. Sw. Motor Freight*, 154 F.3d 641, 646 (6th Cir. 1998).

### 3.

It is undisputed that Gavulic has offered a legitimate non-discriminatory explanation for recommending Smith's termination. As stated in her declaration, she thought that Smith lacked "institutional credibility" due to concerns that others at Hurley, including executives, did not trust him. (R. 28-4, PID 654.) Gavulic herself maintains she could not trust Smith and could not "go forward as CEO of HMC without the ultimate trust in my legal advisor." (R. 28-4, PID 662.) Ultimately, Gavulic recommended Smith's termination because "I could not continue to work with him and did not believe it would be in the best interests of the Medical Center." (R. 28-4, PID 663.) The Board's resolution similarly noted that "there are irreconcilable differences between the CEO and the General Counsel that impair the operations of the medical center." (R. 28-5, PID 764.)

### 4.

The question now becomes whether Gavulic's reasons were a pretext for racial discrimination.

In general, "[a] plaintiff may show pretext by demonstrating: '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the adverse employment action, or (3) that they were insufficient to motivate the adverse employment action.'" *Davis v. Cintas Corp.*, 717 F.3d 476, 491 (6th Cir. 2013) (alterations in original) (quoting *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004)); *see also*

*Alexander v. Ohio State Univ. Coll. of Soc. Work*, 429 F. App'x 481, 487 (6th Cir. 2011) (applying the same test to a Section 1983 discrimination claim).

Smith does not specify which theory of pretext he pursues. But "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). In other words, "at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Id*. In the summary judgment context, this requires Plaintiff to "produce[] evidence from which a jury could reasonably doubt the employer's explanation." *Id*. The evidence of discrimination that Smith relies on does not satisfy this burden.

First, Smith maintains in his brief that he "testified that Defendant Gavulic was engaging in race discrimination during the NICU incident in 2012 and 2013." (R. 35, PID 1484.) Yet his testimony does not even begin to explain why he believes that. He simply testified that he told Gavulic about the incident. (R. 35-3, PID 1512.) And he points to nothing to rebut Gavulic's own take on the incident—that Smith's advice against race-based nursing assignments "is, of course, sound legal (and moral advice)." (R. 28-4, PID 659.) Gavulic's declaration adds that others made the same recommendation, including the nurse manager of the NICU, the chief nurse, and the administrator for women and children services, and none of them suffered any adverse employment consequences for their advice. (R. 28-4, PID 659.) In short, there is nothing in the record that establishes any discriminatory animus on the part of Gavulic in her handling of the NICU incident. Smith's unsupported and conclusory allegation that Gavulic discriminated on the basis of race in connection with this incident does not create a genuine issue of material fact on the issue of pretext.

14

Second, Smith says he "testified extensively that he was treated differently than his White executive level counterparts by being excluded from meetings." (R. 35, PID 1494; R. 30-2, PID 1064–65.) But Smith's testimony on this issue amounted to nothing more than speculation. He had the suspicion that the meetings happened "at least monthly . . . [b]ecause I was only communicated with by her, generally speaking, generally speaking. Occasionally I would be in a meeting with all of them, but generally I was only communicating with—by her with her when I had my routine. . . . And I know they had to communicate in order to function and to know what guidance she was giving them, what direction." (R. 30-2, PID 1065.) But he later admitted it was simply his belief that the meetings "probably" or "may have" happened, but he did not know when they happened or what the subject matter of the meetings was. (R. 30-2, 1064–65.)

Speculation of this sort "does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *See Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) (emphasis in original), *cited with approval in Cobb v. Keystone Memphis, LLC*, 526 F. App'x 623, 630 (6th Cir. 2013). But even if such speculation could create a genuine issue of material fact, admissions in the record made clear that, if anything, Smith's access to meetings with Gavulic was even more favorable than other executives. Smith's response brief (*see* R. 35, PID 1482) admits this fact from Defendants' motion (*see* R. 28, PID 377), which cited to Gavulic's declaration, (R. 28-4, PID 660): "Gavulic met with Smith at least weekly, and the meeting was calendared for an hour-and-a-half. Some meetings lasted longer. No other executives met with Gavulic routinely on a weekly basis. Smith was always invited to and nearly always attended senior leadership meetings." Thus, Smith has failed to demonstrate that he was treated differently from similarly situated executives.

15

Third, Smith cites the temporal proximity between his October 2014 written complaint and Gavulic's conclusion that she could no longer trust him. (R. 35, PID 1493–94.) Without explanation, he says this establishes that Gavulic's reasons for pushing him out were pretexts for racial discrimination. (*Id.*) Even in the retaliation context, "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012). Temporal proximity has even less relevance to establish pretext in a discrimination claim. *See Adamov v. U.S. Bank Nat. Ass'n*, 726 F.3d 851, 855 (6th Cir. 2013) (noting that plaintiff's temporal proximity argument was relevant to a retaliation claim but "less probative with respect to the idea that the decision to terminate [plaintiff's] employment was made on the basis of his national origin").

The Court struggles to see how the timing between Smith's complaint and Gavulic's recommendation to terminate him could lead a reasonable jury to conclude that she acted with racial animus. Smith stresses that shortly before his complaint, in February 2014, Gavulic recommended Smith for a one-percent lump-sum payout of his salary (along with salary increases to other executives) to "acknowledge their ongoing positive contributions to the organization." (R. 35-14, 1623.) But this one-time payout does not call into question the undisputed reality that Gavulic's and Smith's relationship was strained. Nor does it show she harbored any racial animus toward him. Moreover, as will be discussed in further detail in connection with Smith's state-law claims, he has failed to point to evidence suggesting that Gavulic was even aware that he had specifically complained that she engaged in *racial discrimination*.

Even if Gavulic had been aware that Smith complained of her alleged discrimination, the undisputed evidence establishes that Gavulic attempted to continue working with Smith after his

16

October 2014 complaint. For instance, following the recommendation of Hurley's human resources department, Gavulic agreed to meet regularly with a third-party present to document her meetings with Smith. (R. 29-1, PID 945.) When that became impractical, Gavulic did not suddenly decide to terminate Smith. Instead, she recommended to the Board that he should be retained as the Board's general counsel and a separate general counsel position should be created for "operations." (R. 28-5, PID 746.) The Board at first accepted that approach but then determined that it would make little sense to have two general counsels. Only when the dual general counsel option was off the table—and only at the Board's request—did Gavulic recommend Smith's termination. Thus, the Court does not believe that this mere sequence of events could lead a reasonable jury to find that Gavulic discriminated against Smith on the basis of his race.

Finally, Smith cites the Dennings hiring situation and his own belief that this demonstrated Gavulic's racial animus. (R. 35, PID 1494.) This appears to be an invitation to engage in a mini-trial on whether racial animus motivated Gavulic's decision to pass on Dennings. If so, Smith would not even be able to make out a *prima facie* case of discrimination as to Dennings: she withdrew from consideration, and no one was hired to fill the position (including the White candidate that Smith and Gavulic considered but ultimately rejected). (R. 30-2, 1049; R. 28-5, PID 752.)

Moreover, Gavulic has offered several legitimate reasons for passing on Dennings, and Smith has failed to show that any of those reasons were themselves pretexts for racial discrimination. First, Gavulic was concerned that Dennings had no experience with several issues that would be part of her duties, including "Stark Law" (which governs physician referrals for Medicare and Medicaid patients), physician contracts, healthcare law, and enterprise risk

management. (R. 28-5, PID 751.) Smith maintains that these knowledge gaps were insignificant because the "major focus for the hiring was to reduce the labor employment law related expenses." (R. 30-2, PID 1042.) Smith also stresses that the job description did not expressly mention Stark Law, physician contracts or "enterprise risk management," but the job description did call for "[c]onsiderable knowledge of applicable federal/state/local laws, health care regulations, and risk management standards and techniques." (*See* R. 35-7, PID 1586; R. 35-8, PID 1596.) As for Gavulic's second concern, she thought that Dennings lacked confidence and thus would be ill-equipped to "exud[e] the trust necessary to provide counsel to the organization." (R. 28-5, PID 751, 786.) Smith does not appear to rebut this concern. Finally, Gavulic was concerned that the only question Dennings asked during her interview (keep in mind with the CEO) was what hours the job would entail, making Gavulic think that Dennings had a "shift worker mentality." (R. 28-5, PID 751, 786.) Smith claims that Dennings' question should not have been a "disqualifier," but he admits that it would have been a "concern." (R. 30-2, PID 1046.)

Smith fails to explain how racial animus motivated Gavulic's decision to pass on Dennings or how that ties into her later decision to recommend restricting his duties and then his termination. Smith cites in passing, *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 392 (6th Cir. 2009), which held, "Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff," because "such evidence does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." But Smith does not even begin to explain how there was a discriminatory atmosphere at Hurley, nor does he discuss the factors courts use to

18

determine whether evidence of a discriminatory atmosphere is probative of discrimination. *See Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 665 (6th Cir. 2013) (alterations in original).

In sum, Smith has failed to point to evidence sufficient to create a genuine issue of material fact concerning whether Gavulic's reasons to recommend his termination were a pretext for racial discrimination.

## B.

The Court next turns to Smith's First Amendment retaliation claim. His theory is that Gavulic and the Board retaliated against him because of his October 2014 memo and oral complaints of racial discrimination, which he says were protected speech.

"For a public employee such as [Smith] to establish a prima facie case of retaliation in violation of the First Amendment, he must demonstrate '(1) that [he] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [him] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [his] constitutional rights.'" *Boulton v. Swanson*, 795 F.3d 526, 530–31 (6th Cir. 2015) (quoting *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (all but first alterations in original)). Defendants argue that summary judgment is warranted on Smith's First Amendment claim because the speech at issue was not constitutionally protected. The Court agrees.

As the Supreme Court has explained, whether a public employee's speech is protected

> requires determining whether the employee spoke as a citizen on a matter of public concern. . . . If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. . . . If the answer is yes, . . . [t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

19

*Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citations omitted). "The threshold inquiry, in turn, has two components: whether the employee was speaking as a citizen and whether the topic was a matter of public concern." *Boulton*, 795 F.3d at 531–32 (citation omitted). The heart of the parties' dispute is the first component—whether Smith spoke as a citizen when he made his written complaint to Bekofske in October 2014 and complained in-person to Bekofske and the Board about Gavulic's alleged racial discrimination.

The Supreme Court first explained what it means to speak as a citizen in *Garcetti*. The plaintiff there, a deputy district attorney "calendar deputy," claimed he was retaliated against for writing an internal memo that recommended dismissing a case due to alleged prosecutorial misconduct. *Garcetti*, 547 U.S. at 414–15. The Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id*. at 421. The Court also held that the plaintiff's memo was not protected activity, reasoning that he "spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case." *Id*.

The Supreme Court considered again what it means for a public employee to speak as a citizen in *Lane v. Franks*, — U.S. —, 134 S. Ct. 2369 (2014). Lane claimed that his employer retaliated against him for testifying, under subpoena, at two criminal trials against a former employee. *Id*. at 2375–76. The Court clarified *Garcetti*, holding that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id*. at 2379. The Court thus held that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Id*.

20

Thus, the Court further held that the First Amendment "protects a public employee who provides truthful sworn testimony, compelled by subpoena, outside of his ordinary job responsibilities." *Id*. at 2378. It followed that the Court found Lane's sworn testimony to be speech as a citizen, reasoning that when a public employee testifies under oath he has an "independent obligation" to tell the truth, which "renders sworn testimony speech as a citizen and sets it apart from speech made purely in the capacity of an employee." *Id*. at 2379.

The circumstances surrounding Smith's complaint memo compel the conclusion that he spoke pursuant to his official duties. Courts look to several factors to determine whether an employee's speech was pursuant to his official duties, including "the impetus for [his] speech, the setting of [the] speech, the speech's audience, and its general subject matter." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 540 (6th Cir. 2012). All of these factors weigh against Smith.

To start, the audience of Smith's October 2014 written complaint was the then-Board chair, Bekofske. Smith also said that he made oral complaints to Bekofske when discussing the memo, and later made an oral complaint to the Board itself. This is a problem for Smith: "[c]ases from other circuits are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010) (quoting *Davis v. McKinney,* 518 F.3d 304, 313 (5th Cir. 2008)); *but see Davies v. Trigg Cty., Kentucky*, No. 5:16-CV-00068-TBR, 2016 WL 7105931, at *6 (W.D. Ky. Dec. 5, 2016) (calling into doubt whether *Fox* survived *Lane*).

The subject matter of the memo reinforces the conclusion that Smith acted pursuant to his official duties. The lengthy document describes the many incidents and workplace problems he

21

had with Gavulic, concluding, "I am sorry that I have to make this request but I really have no other option in order to, hopefully, rectify the situation, stop this harassing, discriminatory and retaliatory behavior/conduct[.]" (R. 28-10, PID 850.) And Smith's stated impetus for the memo was: "to inform [the Hurley Board chair] of a pattern of practices (including, but not limited to, undermining and harassing General Counsel, interfering with General Counsel's ability to do his job, isolating General Counsel and, basically removing General Counsel/Risk Manager's job duties/responsibilities) that have been engaged in by the President & CEO . . . for a protracted period of time." (R. 28-10, PID 840.) True, the memo may lend itself to a vague reading that Smith was in part complaining of racial discrimination (though Smith admits that he purposely removed express references to racial discrimination). (*See* 30-2, PID 1081–82.) The memo mentions "discrimination," and at least two episodes involving race—such as the Dennings hiring situation and the NICU incident, and Smith claims that he separately complained of racial discrimination when speaking with Bekofske and the Board. But the overwhelming majority of issues raised in Smith's complaint had nothing to do with race, strongly suggesting this is the type of "employee beef" that is not protected speech under the First Amendment. *See Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 365 (6th Cir. 2007) (holding that "the quintessential employee beef: management has acted incompetently" is not protected activity).

Next, the Court has considered the speech's setting. The parties agree that Smith's memo was an "employment-related memo under Hurley's Executive Employee Relations Policy." (*See* R. 28, PID 377; R. 35, PID 1482; R. 28-10; R. 30-2, PID 1017.) The memo's "regarding" line reads: "Employment Related Concerns/Executive Employee Relations Policy." (R. 28-10, PID 840.) The memo also states that because of Gavulic's alleged conduct, Smith was "left with no option but to officially request implementation of the ***Executive Employee Relations Policy***,

specifically, page 2, **Section II. VICE PRESIDENTS REPORTING DIRECTLY TO THE CEO, 2ⁿᵈ and 3ʳᵈ paragraphs, which reads, in pertinent part:** . . . _**All**_ other _**employment related concerns**_ that cannot be resolved by the CEO or VP for Human Resources _**shall be directed to the Chair**_ of the Board of Managers, _**in writing**_, who will refer it to an appropriate Board Committee or to the Board. _**The Board Committee or the Board, as applicable, shall utilize appropriate resources to conduct and complete an investigation.**_" (R. 35-4, PID 1573–74. (emphasis in the original.)).

As a Sixth Circuit panel has observed, "acting pursuant to an organization's accepted procedure for employee complaints tends to suggest that the person was acting pursuant to her job duties." _Keeling v. Coffee Cty., Tenn._, 541 F. App'x 522, 527 n.5 (6th Cir. 2013). Granted, _Keeling_ came before _Lane_, but _Lane_ does not preclude a finding that a general counsel of a public hospital sending a written complaint about the hospital CEO to the chair of the hospital's Board pursuant to formal hospital policy is acting pursuant to his job duties.

What really forecloses any issue of fact surrounding whether Smith's speech was pursuant to his official duties is the scope of his role as general counsel. Gavulic avers that part of Smith's responsibility included "mak[ing] recommendations to the Board and HMC administration on policies, procedures, and all legal issues impacting the Medical Center[, including] . . . keeping the Board apprised of complaints of race discrimination, which he did in executive sessions of Board meetings when such allegations arose." (R. 28-4, PID 652.) True, Smith's job description does not expressly state that reporting racial discrimination issues was part of his responsibilities or duties. (_See_ R. 35-2, PID 1506–08.) But that does not necessarily matter: "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is

neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424–25. And regardless of whether Smith's job description included reporting discrimination, he testified that his actual duties were sweeping, including being "responsible for . . . any of the legal issues," including "any litigation, any legal issues that may involve the Board or administration . . . all legal issues." (R. 30-2, PID 1007–08.)

Thus, if Smith's October 2014 complaint really concerned racial discrimination as he now claims—surrounding the NICU incident, the Dennings hiring situation, and his own treatment under Gavulic—he acted pursuant to his duties when he reported and addressed that. He was, after all, responsible for "all legal issues." If instead, as Defendants maintain, Smith intentionally stripped away his complaint's references to race to avoid making a racial discrimination complaint, then he would have an insurmountable problem under the second component of the first step of the *Garcetti* inquiry—which asks whether the topic of the speech was a matter of public concern. *See Boulton*, 795 F.3d at 531–32. It is hard to imagine how his complaint about his supervisor's treatment of him—in the absence of racial discrimination— would amount to an issue of public concern. *Compare Perry v. McGinnis*, 209 F.3d 597, 608 (6th Cir. 2000) (noting that "racial discrimination is inherently a matter of public concern"), *with Haynes*, 474 F.3d 357, 365 (6th Cir. 2007) (holding that "the quintessential employee beef: management has acted incompetently" is not protected speech).

In sum, the Court finds that because of Smith's admittedly wide scope of job duties and the content and context of his complaint, he made his complaint pursuant to his official duties as

24

Hurley's general counsel. Because the speech is thus not protected under the First Amendment, Defendants are entitled to judgment as a matter of law for this claim.[2]

## C.

The Court turns next to Smith's state-law claims that Gavulic and the Board retaliated against him in violation of the Michigan Whistleblowers' Protection Act and the Elliott-Larsen Civil Rights Act. The *McDonnel-Douglas* burden-shifting framework applies to claims under each statute. *See Debano-Griffin v. Lake Cty.*, 828 N.W.2d 634, 638 (Mich. 2013) (WPA); *see also Edwards v. Credit Acceptance Corp.*, No. 243140, 2004 WL 1103773, at *6 (Mich. Ct. App. May 18, 2004) (per curiam) (ELCRA retaliation).

By way of background, Michigan's WPA provides in relevant part:

> An employer shall not discharge . . . an employee . . . because the employee . . . reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule  promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false[.]

Mich. Comp. Laws § 15.362. "Under the WPA, a plaintiff may establish a prima facie case by showing that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the defendant took an adverse employment action against the plaintiff, and (3) 'a causal connection exists between the protected activity' and the adverse employment action." *Debano-Griffin*, 828 N.W.2d at 638 (citation omitted).

---

[2] At oral argument in response to the Court's questioning and in a post-hearing brief, Defendants have taken the position that qualified immunity also shields Gavulic from Smith's Section 1983 claims. (R. 39.) While Gavulic waived that defense at the summary judgment stage by failing to raise it earlier, she would still be able to assert a qualified immunity defense at later stages. *See English v. Dyke*, 23 F.3d 1086, 1090 (6th Cir. 1994). This would be another likely ground for dismissal of the First Amendment claim against Gavulic, as the Court notes that Smith has not pointed the Court to any post-*Lane* law that clearly establishes that this type of complaint memo constitutes protected speech.

ELCRA makes it unlawful to "Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." Mich. Comp. Laws § 37.2701(a). To establish a prima facie case of retaliation under ELCRA, Smith must show "(1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Garg v. Macomb Cty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 653 (Mich. 2005), *opinion amended on denial of reh'g* (July 18, 2005).

Other than in unsolicited post-oral argument briefing, the parties have offered little briefing specific to these claims and have instead proceeded on the mistaken assumption that the standards governing these claims rise and fall entirely along with Smith's First Amendment retaliation claim. Nonetheless, the Court will address the few arguments that Defendants have made, which apply to Smith's *prima facie* case of retaliation under both state-law claims.

## 1.

First, Defendants argue that Gavulic is entitled to summary judgment on both state-law retaliation claims because she did not know that Smith had engaged in protected activity—*i.e.*, that he had complained about racial discrimination. The Court agrees.

For Smith's ELCRA retaliation claim, he must show that Gavulic knew of his protected activity. *See Garg*, 696 N.W.2d at 654.

Unlike for ELCRA claims, knowledge is not an element of a *prima facie* case of retaliation under the WPA. *See Debano-Griffin*, 828 N.W.2d at 638 (listing the elements). But knowledge is still required for WPA claims. *See McBrayer v. Detroit Med. Ctr.*, No. 294268,

2010 WL 5175458, at *3 (Mich. Ct. App. Dec. 21, 2010) (per curiam) ("When there is no evidence that the employer knew about protected activity at the time of the plaintiff's discharge, the requisite causal connection cannot be established."); *see also Kaufman & Payton, P.C. v. Nikkila*, 503 N.W.2d 728, 732 (Mich. Ct. App. 1993) (holding that a defendant is "entitled to objective notice of a report or a threat to report by the whistleblower"); *see also* M Civ JI 107.03, Whistleblowers' Protection Act: Causation (instructing that for WPA retaliation claims "[i]n order to prove causation, plaintiff must show that a decision-maker or a person who influenced the decision knew of plaintiff's protected activity").

Smith has not shown that Gavulic knew of his purportedly protected activity under ELCRA or the WPA. Importantly, Smith's response brief makes this key admission from Defendants' statement of facts: "Gavulic did not see Plaintiff's Complaint Memo until after Smith's lawsuit was filed on January 28, 2015. She was not present in the room when Smith allegedly raised racial discrimination to the Board. Gavulic was unaware that Smith was claiming she had discriminated against him on the basis of race until the filing of the lawsuit." (R. 30-4, PID 663; R. 28, PID 382–83; R. 35, PID 1484.)

Despite this admission, Smith urges in another portion of his response brief that Gavulic was aware that Smith complained of racial discrimination because while she did not see Smith's memo, she did see Walker's summary of that memo. (R. 35, PID 1497.) Specifically, Walker's report listed out many of the concerns that Smith wrote in his October 2014 memo and noted up front that "Smith alleges a pattern of practice (including, but not limited to), undermining, *harassing*, removing job duties/responsibilities, isolating and interfering in General Counsel's ability to do his job. General Counsel is the only African American Executive; the longest tenured executive (over 28 years) at Hurley Medical Center." (R 35-9, PID 1599 (emphasis

27

added).) Smith urges that the mention of "harassing" was enough to "lead one to conclude that Plaintiff was being racially 'harassed.'" (R. 35, PID 1497.)

But the facts as described in Walker's memo do not lend themselves to any conclusion that Smith had asserted a "racial harassment" complaint against Gavulic. Nothing in the summary explains how Gavulic harassed Smith or anyone else, let alone on an illegal basis like race. And nothing connects this supposed "harassment" to the claim that Smith now says is the basis of his retaliation counts: his complaint of racial discrimination. Walker's memo says nothing about "racial discrimination" or even "discrimination." The mere mention of the word *harassing* in a summary of Smith's gripes with Gavulic could not lead a reasonable jury to find that she was aware that he had specifically made a racial discrimination complaint—especially given that Smith openly admits that she did not know about his supposed racial discrimination complaint. This is fatal to Smith's state-law retaliation claims against Gavulic.

Accordingly, Gavulic is entitled to judgment as a matter of law for Smith's WPA and ELCRA claims.

### 2.

Defendants next argue that the claims against the Board fail as well because Smith has not shown that his purportedly protected activity caused the Board's decision to terminate him (or that the Board's decision was a pretext for retaliation). The Court agrees.

Granted, the temporal proximity between Smith's October 2014 memo and the Board's decision to terminate in January 2015 is somewhat close. The timing is even closer when it comes to the oral racial discrimination complaint Smith claims he made to the Board and the Board's decision to place him on administrative leave. In particular, Smith testified that after he filed his written complaint on October 7, 2014, he appeared at a Board meeting on November 24,

2014 and orally reported a claim of racial discrimination. (R. 30-2, PID 1076.) At that very meeting, after Smith spoke, the Board excused him and brought Gavulic into the room. (R. 28-4, PID 663.) The Board then asked if Gavulic would recommend terminating him in the absence of a dual general counsel system, and she said that she would. (*Id.*) In response, the Board voted to place Smith on administrative leave and later, in January 2015, voted to terminate him. (*Id.*)

Still, under both the WPA and ELCRA, causation cannot be established solely by a close temporal proximity between the protected activity and the adverse action. *See Debano-Griffin*, 828 N.W.2d at 639 (noting that under the WPA, "[s]omething more than a temporal connection between protected conduct and an adverse employment action is required to show causation"); *see also Garg*, 696 N.W.2d at 660 (holding same under ELCRA); *McCray v. Carter*, 571 F. App'x 392, 399 (6th Cir. 2014) ("To establish the causation element of her prima facie [WPA] claim, Plaintiff must 'show that h[er] employer took adverse employment action because of [her] protected activity,' not simply that she was terminated 'after the protected activity occurred.'") (*quoting, West v. Gen. Motors Corp.*, 469 Mich. 177, 665 N.W.2d 468, 472 (Mich. 2003)).

The evidence beyond temporal proximity does not create a genuine issue of material fact on whether Smith's purportedly protected activity caused his termination or whether the Board's stated legitimate reason for terminating him was a pretext for retaliation. For one, Smith admitted at his deposition that he did not believe that anyone on the Board acted with a retaliatory motive and that only Gavulic harbored such animus:

> Q   Who specifically on the board did you think had a retaliatory motive?
>
> A   I don't know that anybody on the board specifically had it. I believe Ms. Gavulic had it, and she was the one that was directing the board and their actions.
>
> Q   All right. So your—your belief is that the retaliation is coming from Ms. Gavulic and the board adopted that?

A      Right.

Q.     Okay. Not that someone on the board in particular had a retaliatory motive?

A      No.

Q      Correct?

A      Yes.

(R. 30-2, PID 1080; *see also* R. 30-1, PID 993; R. 35, PID 1484.)

The other problem is that Smith has pointed to testimony from only two out of the nine voting Board members, Charlotte Edwards and Carl Bekofske, the Board's chair. Smith has offered nothing suggesting Edwards personally may have been improperly motivated. As for Bekofske, his testimony is ambiguous. Bekofske testified that Smith's written complaint "initiate[d] this whole thing" and "[i]n my eyes . . . initiated the proceedings that bring us here today." (R. 35-15, PID 1627, 1629.) Asked whether he believed the complaint "initiated the need for [Smith's] termination," Bekofske responded, "Yes" and that "this was the event that crystallized it." (R. 35-15, PID 1629.) He went on to explain that the complaint, along with "things that transpired thereafter . . . assisted me in voting yes [to terminate]." (R. 35-15, PID 1629.) The overall context of Bekofske's testimony strongly suggests that what he meant was that he voted to terminate Smith because the complaint—a 12-page single-spaced memo that made no express mention of racial discrimination—reflected irreconcilable differences between the general counsel and CEO, not because the complaint was a report of racial discrimination.

But even assuming that a reasonable jury could find that Bekofske's testimony means his vote was improperly motivated, his one vote is not enough to show that the Board itself acted out of a retaliatory motive. This is because Smith cannot show that an improper motivation stood behind a "deciding margin" of votes. (Indeed, he does not try to. Again, Smith's claim is based

30

on Gavulic's alleged retaliatory animus and not any direct animus by the Board.) The Sixth Circuit articulated this "deciding margin" standard in the Section 1983 context in *Scarbrough v. Morgan County Bd. of Education*, 470 F.3d 250, 262 (6th Cir. 2006), where the Court adopted a "but for" causation approach to Board liability and held that "where improperly motivated members supply the deciding margin, the Board itself is liable."

The Court believes that a Michigan court would apply the same "deciding margin" standard to the causation requirements for WPA and ELCRA retaliation claims.

An employer is liable under the WPA if "the plaintiff's protected activity was a 'motivating factor' for the employer's adverse action." *Debano-Griffin*, 828 N.W.2d at 639. This is obviously a less stringent requirement than "but for" causation. But under general principles of Michigan employment law, a "motivating factor" means that an improper motive "made a difference in the contested employment decision." *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 522 (Mich. 2001). The Michigan model jury instruction for causation under the WPA explains the same: "Protected activity does not have to be the only reason, or even the main reason, but it does have to be one of the reasons that *made a difference* in defendant's decision to [discharge] the plaintiff." Mich. M Civ JI 107.03 Whistleblowers' Protection Act: Causation. Thus, it would seem that a deciding margin of improperly-motivated votes would be necessary for protected activity to make a difference in a Board's decision. *See McCray*, 571 F. App'x at 398 (6th Cir. 2014) (applying "deciding margin" standard to a Michigan WPA claim).

An even better case can be made that the "deciding margin" standard would apply under ELCRA, where a more stringent standard than "motivating factor" applies.

Traditionally, courts have required plaintiffs claiming retaliatory discharge under ELCRA to show that their protected activity was a "significant factor" in the employer's adverse action.

31

See Polk v. Yellow Freight Sys., Inc., 801 F.2d 190, 198 (6th Cir. 1986); *see also Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001) (same). Recent Supreme Court jurisprudence in the Title VII and ADEA cases suggest even more is required. In particular, in *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 2533 (2013), the Supreme Court read "but for" causation into Title VII retaliation claims. Michigan courts have not settled on whether "but for" causation applies to ELCRA claims. Recent state-court decisions have either dodged the issue, *see Hensley v. Botsford Gen. Hosp.*, No. 323805, 2016 WL 146355, at *6 (Mich. Ct. App. Jan. 12, 2016) (per curiam), *appeal denied*, 885 N.W.2d 276 (Mich. 2016) (noting the "result would be the same under either standard"), applied the old significant factor test without considering the issue, *see Goodale v. Landscape Forms, Inc.*, No. 322617, 2015 WL 7597464, at *2 (Mich. Ct. App. Nov. 24, 2015) (per curiam), or seemingly equated the two standards, *see Thompson v. Dep't of Corr.*, No. 319668, 2015 WL 1261539, at *5 (Mich. Ct. App. Mar. 19, 2015) (per curiam) (citing but-for causation as an example of significant factor causation).

Nonetheless, the Court finds persuasive a recent opinion from a Sixth Circuit panel that affirmed a district court's application of the "but for" standard to an ELCRA retaliation claim. In particular, in *Beard v. AAA of Michigan*, 593 F. App'x 447, 452 (6th Cir. 2014), the Court observed that "[g]enerally, Michigan courts recognize the persuasive force of federal Title VII precedent in interpreting ELCRA" and have only "refused to defer to federal Title VII interpretations when doing so 'would nullify a portion of the [Michigan] Legislature's enactment." *Id.* (internal quotation marks and citations omitted). The Court thus concluded that a Michigan court would follow the Supreme Court's Title VII lead and adopt "but for" causation

for ELCRA retaliation claims because "a side-by-side reading of Title VII's and ELCRA's retaliation provisions suggests similarity, not difference, in the statutes' causation requirements."

In any event, the Court has already found it appropriate to apply the "deciding margin" standard under the more lenient "motivating factor" test, so regardless of whether "significant factor" or "but for" causation applies under ELCRA, the Court sees little reason not to apply the "deciding margin" standard.

Thus, the Court will hold Smith to the "deciding margin" standard for his WPA and ELCRA claims against the Board. This standard does not always require showing that a majority of Board members were improperly motivated. *See McCray*, 571 F. App'x at 398. For instance, assume that nine Board members voted—four voted not to fire, four voted to fire for unquestionably permissible reasons, and the final member voted to fire for an impermissible reason. That one impermissibly motivated vote would be a "deciding margin." But here, Smith needs to show that a majority of votes were improperly motivated. Hurley's 15-member Board requires eight members for a quorum, and a majority vote is required for the Board to take action. (R. 28-4, PID 652.) At the January 2015 Board meeting that resulted in Smith's termination, nine Board members voted unanimously to terminate him. (R. 28-3, PID 649–50.) So under the "deciding margin" standard, Smith would have to show that at least five of the nine unanimous votes were improperly motivated.

But Smith has, at most, raised a genuine issue of material fact concerning whether one voting Board member, Bekofske, acted out of retaliation. As for the other Board members, Smith can point only to the temporal proximity between his complaint and his termination. Especially given his admission that he believed no one on the Board had retaliatory animus toward him, that temporal proximity is not enough for any reasonable jury to find that improperly-motivated

33

Board members provided a deciding margin of votes. And to the extent that Smith would urge that the Board should be liable for retaliation for simply rubber-stamping Gavulic's recommendation to terminate him, as discussed, Smith has failed to show that even her recommendation was improperly motivated, as he has admitted that she had no knowledge of his purportedly protected activity.

In sum, Smith claims to be a whistleblower because he complained about racial discrimination by Gavulic. But Smith admits (1) Gavulic was unaware of this activity at the time she recommended his termination (R. 35, PID 1484) and (2) he was not aware of the Board having retaliatory animus (30-2, PID 1080; R. 35, PID 1484). For the reasons stated, Hurley is thus entitled to judgment as a matter of law on Smith's WPA and ELCRA claims.

### IV.

For the reasons discussed, Defendants' Motion for Summary Judgment (R. 28) is GRANTED because Smith has raised no genuine issues of material fact concerning Defendants' liability.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: January 13, 2017                    U.S. DISTRICT JUDGE

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 13, 2017.

s/Keisha Jackson
Case Manager