UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


WILLIAM D. SMITH,

              Plaintiff,

                               HON. LAURIE J. MICHELSON
      v.
                               No. 15-10288

MELANY GAVULIC and HURLEY
MEDICAL CENTERS,

              Defendants.
_____/


MOTION FOR SUMMARY JUDGMENT

Detroit, Michigan --  Wednesday, December 28, 2016


APPEARANCES:

Michael E. Freifeld, Esq.     Eric J. Pelton, Esq.
Glen N. Lenhoff, Esq.        Thomas J. Davis, Esq.
Law Offices of Glen Lenhoff   Kienbaum Opperwall Hardy & Pelton
328 S. Saginaw St,          280 N. Old Woodward Ave., #400
8th Floor North Building      Birmingham, MI 48009
Flint, MI 48502             Tel: (248) 645-0000
Tel: (810) 235-5641         epelton@kohp.com
lenhofflaw@usol.com         tdavis@kohp.com
On behalf of Plaintiff      On behalf of Defendants


-   -   -


To Obtain A Certified Transcript, Contact:
Nefertiti A. Matthews, Official Court Reporter
Theodore Levin United States Courthouse
231 West Lafayette Boulevard, Room 234
Detroit, Michigan  48226
www.transcriptorders.com • jodi_matthews@mied.uscourts.gov

Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.

**Motion for Summary Judgment**
**Wednesday, December 28, 2016**

# I N D E X

- - -

Hearing:                                              Page: Vol.:

**Motion for Summary Judgment** ......................3    **1**

Argument By Mr. Pelton  ..........................3      1

Response By Mr. Freifeld  ......................26      1

Response By Mr. Pelton  ........................48      1


Certification of Reporter ......................53

**Motion for Summary Judgment**
**Wednesday, December 28, 2016**

3

1                          **Detroit, Michigan**

2                          **Wednesday, December 28, 2016**

3                          **1:55 p.m.**

4                              **-   -   -**

5          **THE CLERK:**  The Court calls Case Number 15-10258;

6    <u>Smith versus Gavulic and Hurley Medical Center</u>.  Counsel,

7    please state your appearances, for the record.

8          **MR. PELTON:**  Eric Pelton, on behalf of the

9    defendants.

10         **MR. FREIFELD:**  Mike Freifeld, appearing on behalf of

11   the plaintiff.

12         **MR. LENHOFF:**  Glen Lenhoff, Your Honor, on behalf of

13   the plaintiff.

14         **MR. DAVIS:**  Thomas Davis, on behalf of the

15   defendants.

16         **THE COURT:**  All right.  Good afternoon, everyone.

17   It's good to see you and it's good to have these hearings on

18   these dates so that the lawyers do know we operate during the

19   holidays.  I appreciate you-all accommodating the schedule from

20   last week.  We did have a criminal trial, that is the reason

21   that we had to adjourn this.

22       But we're here on the Defendant's Motion for Summary

23   Judgment.  So, I'll start with you, Mr. Pelton.

24                    **Motion For Summary Judgment**

25   **ARGUMENT BY MR. PELTON**

1        **MR. PELTON:**  Thank you and good afternoon, Your

2   Honor.  As you noted, this is our Motion for Summary Judgment.

3        You know, I think one of the helpful aspects of courts, as

4   this Court did here, requiring the parties to put numbered

5   factual assertions up front in the briefs and to require

6   specific responses to those, is that it's harder to obscure the

7   record and the admissions on material facts stand out.  And

8   here there's a number of admissions that require summary

9   judgment, in this case, in favor of the defendants.

10       First, Ms. Gavulic, the CEO, was not a decision maker.

11  Fact Five, uncontested, that only The Board had the authority

12  to terminate the General Counsel.

13       Fact 44, The Board did terminate, through a unanimous

14  resolution.

15       Facts 40, 41, Gavulic had only made recommendations first

16  to split duties and later when pushed, forced to make a final

17  recommendation to recommend that Smith's employment be

18  terminated.  There's nothing --

19       **THE COURT:**  But isn't this somewhat, if not

20  completely analogous to the Cat's Paw Theory?  I mean, if the

21  person making the recommendation, let's say, has every

22  discriminatory animus in the world and they know The Board is

23  just going to rubber stamp their recommendation, could that

24  person avoid liability by claiming, "I'm not the decision

25  maker"?

1     **MR. PELTON:**  Yes, and in fact, that's what the courts

2  have held.  First of all, Cat's Paw doesn't apply here because

3  they haven't sued Hurley for race discrimination.

4     **THE COURT:**  No, I understand the theory.  But the

5  thought behind the theory, that you can't avoid liability

6  because the person with the real animus, who's motivating the

7  decision --

8     **MR. PELTON:**  Right, because a recommendation is that,

9  it's a recommendation, it's not a decision.

10     And I think Judge Edmunds had it right in the Larkett

11  versus Jones case, where she held, under that very situation,

12  where the recommenders in that case were alleged to have made

13  very racist remarks.  There was direct evidence and

14  discrimination on the basis of the recommenders.  But Judge

15  Edmunds held, Yes, the employer can be held liable, but the

16  individuals could not because they were not decision makers.

17  They only recommended, they didn't make a decision.

18     And in holding that, she relied on two different Sixth

19  Circuit cases, the Plautz case and the Hollins case, both that

20  we've cited.  Where the Sixth Circuit held that, "A threat to

21  terminate is not an adverse job action."

22     And the facts here really are very similar to Larkett, but

23  again, they're not as egregious.  Because we'll get to this,

24  but there's really no evidence that race had anything to do

25  with anything.  And so the answer to your question is, No, you

1   cannot hold the individual liable if they're not the decision

2   maker.

3       We also cited some other cases around the country and I

4   wanted to bring to your attention that in the <u>Staub</u> case, and

5   that's the Cat's Paw case out of the United States Supreme

6   Court.  In <u>Staub</u>, the Court said that, "Discrimination was no

7   part of Buck's", that's the decision maker's reason for the

8   dismissal.  And while Korenchuk and Mulally, those are the

9   recommenders, acted with discriminatory animus, the act they

10  committed, the mere making of reports, was not a denial of

11  initial employment, re-employment, retention in employment,

12  promotion, or any benefit of employment as required to be

13  liable.

14      I'd also point out to the Court that in <u>Larkett</u>, which

15  cites to <u>Plautz</u> and the <u>Hollins</u> case.  If you go to the <u>Plautz</u>

16  case, they also cite U.S. Supreme Court's <u>Ellerth</u> decision,

17  <u>Burlington Industries verses Ellerth</u>, where the U.S. Supreme

18  Court says, "A tangible employment action constitute a

19  significant change in employment status", et cetera.  It has to

20  constitute it.  A recommendation doesn't constitute anything,

21  it's only a recommendation.

22      And so we think under those authorities this question of

23  law is pretty clear.  And given the facts that are undisputed

24  here, that Ms. Gavulic was not the decision maker, they cannot

25  hold her liable for race discrimination under Section 1983.

1        The next set of admissions concerned that Ms. Gavulic was

2   not aware of the protective speech and activity.  And again,

3   Fact 49 is critical here, where they admit that she did not

4   seek plaintiff's complaint memo until the lawsuit was filed.

5   She was not present in The Board room when Smith allegedly

6   raised discrimination with The Board.  It's undisputed Walker

7   and Bekofski had not told her.  And she was unaware Smith was

8   claiming she had discriminated against him, on the basis of

9   race, until the filing of the lawsuit.  That's undisputed.

10       The third key admission --

11            **THE COURT:**  Well, don't they say she gleans it from

12   the Walker summary?  I believe is their response to that.

13            **MR. PELTON:**  Well, sure.  But even Walker says that

14   he did not understand that he was complaining of race

15   discrimination, that's also undisputed.  That was Walker's

16   testimony.  And I think that's facts 36 to 38, and if you look

17   at paragraphs 18 and 12 of the affidavits.

18       So, no, there's no evidence of that.  You'd have to glean

19   it from some words, I guess, in the report about harassment and

20   this type of thing.  But that isn't sufficient.  And I think we

21   footnoted in our reply brief the Mitan case which holds that,

22   You've got to be more specific than just generalities.  You've

23   got to be more specific than just discrimination.

24       And on that point of law, Your Honor, let me also bring to

25   your attention the Samuels' case out of the Sixth Circuit.  And

1   this is the <u>Samuels' versus Correctional Medical Services</u>, it's

2   at 591 Fed. App'x 475.  These are almost identical facts.  And

3   the Court says here that, "Statements only vaguely assert

4   Samuels was being harassed, discriminated against, and suffered

5   some retaliation."  Quote, unquote.  "Not once does Samuel

6   suggest in a statement that she was being harassed,

7   discriminated against, or retaliated against based on any

8   protective characteristic such as her race."  It goes on to

9   say, "Moreover, when Samuels subsequently met with Good to

10  discuss her statement, she still did not complain that she felt

11  she was being harassed or discriminated against because of her

12  race."  That's exactly what we have here.

13       When Mr. Smith went and met with Walker about it, he

14  doesn't recall if he told Walker it was about race or not.

15            **THE COURT:**  Well, let's separate.  I don't disagree

16  with you strongly as to Gavulic.  I don't see much in the

17  record that she knew the complaint was about race.  But The

18  Board's a little different, right?  The Board got the full memo

19  and The Board -- at least the testimony is, The Board was

20  orally told, by Mr. Smith, that he was complaining of race

21  discriminations.

22            **MR. PELTON:**  Right, that's the disputed fact.  But he

23  says that's it.  He told them and he got no questions about

24  that.  He also testified that he thought The Board had already

25  made up its mind.  And in any event, he testified that he did

1   not believe that anyone on The Board had a discriminatory

2   animus.

3          Further, he would have to show, under <u>Scarbrough</u>, a Sixth

4   Circuit case, that a majority of The Board acted on

5   impermissible reason.

6               **THE COURT:**  Where does it say the WPA Claim?  Is that

7   the standard that the Sixth Circuit applies in the WPA context?

8               **MR. PELTON:**  <u>Scarbrough</u> relates to a 1983 Claim.

9               **THE COURT:**  Right.  How about in the WPA context?

10  Hasn't the Sixth Circuit rejected that in the WPA context?

11              **MR. PELTON:**  All right.  So, on the State Law Claims

12  the issue would be, did the -- you still got to show they acted

13  with some animus.  And all you have is he thinks it's about

14  race.  Maybe there's knowledge, so, maybe you have a prima

15  facie case, but you can't overcome the non-discriminatory

16  reasons based on timing alone.

17         So, it gets different treatment, but you still have other

18  arguments under the Whistleblower's Act, again, that the

19  non-discriminatory, non-retaliatory reason still stand and

20  timing, alone, isn't going to establish pretext to the

21  non-discriminatory reasons.

22              **THE COURT:**  Don't we have, and let me just look

23  because I don't want to mispronounce his name too badly --

24              **MR. PELTON:**  Bekofski.

25              **THE COURT:**  Where The Board share -- testifies that

 1    it's the memo that, in effect, precipitated the decision?

 2         MR. PELTON:  Well, he doesn't say that.  I think if

 3    the Court reads his testimony through from --

 4         THE COURT:  Smith's written complaint, quote,

 5    "Initiated the proceedings", end quote.

 6         MR. PELTON:  It initiated a series of events that

 7    brought us here today, meaning, the deposition.  He then goes

 8    on to say the events transpired thereafter that led to his

 9    voting to terminate.  Then he says at Page 17, which they don't

10    cite, "Many issues that came out created differences between

11    the CEO and the General Counsel", that's at Page 17.

12         And at 21 and 30 he makes the point, in his deposition,

13    That if the CEO and the General Counsel can't communicate and

14    progress can't be made, that impairs the operation of the

15    hospital.  So, he did go on to articulate his

16    non-discriminatory reasons.

17         He's saying what started The Board's look at this was --

18    Sure, that's the complaint.  But then now everything comes up

19    to them and they see that there's irreconcilable differences.

20         THE COURT:  Well, we've got a different test under

21    the WPA.  We've got, maybe, a little bit of an easier test than

22    under some of these other claims, right?

23         MR. PELTON:  But he's stating a non-retaliatory,

24    non-Whistleblower reason.  And he's one person on a board of

25    many.  Nine who voted unanimously.  And there's nothing to

1    suggest that his reasoning is pretext.

2         In other words, there's intervening events between the

3    complaint to Bekofski and The Board's actions on it three

4    months later.  And they're basing it on the recommendation of

5    the CEO who doesn't know he's complained about race

6    discrimination.

7         And he says, if there's irreconcilable differences, which

8    is what the resolution states, that's the conclusion they drew,

9    then there's your non- retaliatory reason.  So, where is the

10   pretext?

11        **THE COURT:**  But for WPA it's, "Plaintiff was engaged

12   in protective activity."  Okay.  You've got that.

13        Two, "The defendant took an adverse employment action."

14   The Board did.

15        Three, "There's a causal connection between the protected

16   activity and the adverse employment action."

17        And I think the plaintiff's position is, Isn't there a

18   fact issue when The Board Chairman testifies that it's the

19   memo, the complaint, what they're calling the protected

20   activity?

21        Now, that may be a little too broad.  The entire memo is

22   maybe not the protected activity.  The complaining of race

23   discrimination would be the protected activity.  When The Board

24   Chairman is possibly testifying that that's the connection,

25   don't you have a fact issue as to that claim?

1          **MR. PELTON:**  No, because what The Board Chair says is

2     that, "After I get the complaint, a whole bunch of issues come

3     out that tell me there's irreconcilable differences."  He's not

4     saying, "I based my decision on the complaint."  In fact, he

5     denies it quite clearly in his testimony, I think at 17, 21,

6     and 30.  Many issues came out that created differences and

7     that's what he's basing his decision on.

8          If you look at the somewhat ambiguous testimony they're

9     relying on on 15 and 16, he's saying, "Yeah, I get this

10    complaint", and then we're sitting here today, you know.  But

11    it still has to make a difference.  It still has to make a

12    difference in the decision.  They have to prove the connection.

13    And just because it starts a series of events, doesn't mean

14    he's forever protected.

15          **THE COURT:**  It has to be a motivating factor under

16    the WPA.

17          **MR. PELTON:**  That makes a difference in the decision,

18    right.  And I'm telling the Court, if you look at Bekofski's

19    testimony, he's articulated the non-discriminatory reasons, as

20    has The Board, through its resolution.  And there's nothing to

21    suggest that that's pre-textual.  That their real motive was,

22    other than the timing, that their real motive was to retaliate

23    because he had raised an issue to a public body.  There's

24    nothing in the record to support that.

25          **THE COURT:**  Okay.  Continue.  Okay.  I understand

1    your position.

2         MR. PELTON:  And again, he, himself, has said, and

3    this is Fact 48, he does not believe anyone on The Board had a

4    retaliatory motive.  He believed Gavulic might have directed

5    their motives, but no one on The Board had retaliatory motives.

6    So, when you apply those undisputed facts to the law, then you

7    have a situation where Summary Judgment has to be granted.

8         Again, the argument, I think we've covered it, but that

9    Gavulic had no power to terminate and was not therefore, a

10   decision maker.  And again, if the Court has a question about

11   that, and I encourage you to look at Staub, look at Larkett v

12   Jones and the Sixth Circuit case law that Judge Edmunds cites

13   there.  Very similar.

14        Their only argument that they push back on is this Haji

15   case.  But Haji was not a race discrimination case.  Haji was a

16   1983 retaliation case.  It's a different test.  A different

17   standard.

18        THE COURT:  And you're sure in the Edmund's case that

19   the -- that involves a recommender?  The recommender that had

20   the animus in that case?

21        MR. PELTON:  Yeah, there was testimony about not

22   liking the look of the person's hair, as I recall.  And there

23   was testimony from others that, "Oh, she's out to get you."

24   And then she found that the employer could be held liable

25   because they relied on it.  But the recommenders, in their

 1    individual capacity, could not.  It was an Elliott-Larsen case,

 2    but she cites two Sixth Circuit cases as well.

 3         Their only case they relied on is Haji, which we pointed

 4    out in our reply brief is not applicable because it's a

 5    retaliation case.  And that's more about chilling speech, where

 6    a recommender making a threat or something could chill

 7    someone's speech.  That's different than in a race

 8    discrimination context.  So, Haji really has no application

 9    here.

10         The 1983 race claim also, again, we've provided the

11    non-discriminatory reasons.  There was a lack of trust in the

12    plaintiff as the CEO's legal adviser.  She testified that the

13    Vice Presidents, chief nurse, patient advocate, internal

14    auditor, doctors, had all expressed concerns over about a

15    20-month period and that he had lacked institutional

16    credibility.

17         And Smith, himself, agrees this being able to work with

18    the CEO and having a trusting relationship is an important

19    aspect of the job, that's Fact 6.  Yet, plaintiff repeatedly

20    agrees and points out in responding to our facts that they

21    couldn't even meet without a third person being there.  And

22    this was unworkable.  And he agreed that it, unquestionably,

23    evidences a problem with the relationship.  His testimony.

24         So, you have a situation where it's not workable.  She

25    tried to work it.  She tried -- after Mr. Walker made the

**Argument By Mr. Pelton**
**Wednesday/December 28, 2016**                    15

 1    recommendations, she sat down, tried to work it out and

 2    couldn't do it, so, ultimately she proposes separating the

 3    General Counsel's job duties.  He'll report to The Board.

 4    She'll get her own General Counsel.  He'll continue to get the

 5    same pay in benefits.

 6        Testimony undisputed they should not want to see him

 7    terminated.  But The Board forced her hand and basically it's a

 8    "me" or "him" situation and she says, "Well . . .", then, she

 9    recommend Mr. Smith be terminated in that instance.

10        And there's no evidence of pretext or race that comes into

11    any of this as to Ms. Gavulic's motive.  They only raise really

12    two arguments and they're completely unrelated.  One concerns

13    the Neonatal Intensive Care Unit issue.  It was in

14    January/February of '13.  It was two years almost earlier and

15    it was undisputed there that The Board decided to remove his

16    compliance duties.  He thinks it was retaliatory, but that's

17    not the issue here.  The issue is the termination two years

18    later.  And there's no suggestion that Ms. Gavulic played any

19    role in the removal of the compliance duties.

20        Further, it was Ms. Gavulic, after The Board had suspended

21    Mr. Smith, who recommended that he be reinstated.  So, I don't

22    know how they get any racial issue out of that, that

23    Ms. Gavulic had some sort of racial animus.

24        Also, they cite to the hiring or the posting of a position

25    for an attorney that would report to Mr. Smith.  And Mr. Smith

 1   felt they should have hired an African-American candidate --

 2          THE COURT:  Let me ask the dreaded question, what are

 3   the hours?

 4          MR. PELTON:  Well, that was one of them.  And it's

 5   pretty clear, on the record, she had absolutely no experience

 6   in what Ms. Gavulic thought was an important aspect of the job,

 7   which goes beyond just employment law.

 8      Mr. Smith says he views it only as an employment law job.

 9   Ms. Gavulic viewed it much broader.

10          THE COURT:  Did they ever hire anybody for that

11   position?

12          MR. PELTON:  Not while Mr. Smith was there.  She

13   withdrew as a candidate.  They didn't hire the white candidate

14   that Ms. Gavulic preferred.

15          THE COURT:  And why not?

16          MR. PELTON:  They just never got back to it.  It just

17   carried on at that point.  And probably part of it was the

18   differences.  But this is back in February/March of 2014, so

19   again --

20          THE COURT:  Because there's a reference in, I believe

21   this is probably Mr. Walker's Summary Recruitment Process for

22   Assistant Risk Manager:

23      "Due to the significant role of the position . . ., Number

24   Two, The Legal Department, CEO also wanted to interview the top

25   candidates to review for fit.  While both the General Counsel

1   and CEO differed on the top choice, the CEO eventually relented

2   to allow General Counsel the candidate of his choice.  However,

3   the position was never filled."  And then the italics, which I

4   believe is Ms. Gavulic's response:

5       "While we did differ on Ms. Dennings aptitude for the

6   position, we concurred that the male candidate's experience was

7   excellent, but his personality was likely not a great fit."

8       What is that all in reference to?  Is that accurate?

9           **MR. PELTON:**  Well, Mr. Smith would say that -- I

10  believe Mr. Smith would say that Ms. Gavulic never gave him

11  permission to hire Dennings.  But we also know that by that

12  time she had withdrawn her candidacy.  So, she wasn't employed.

13  The white candidate didn't end up getting hired and so you were

14  left with the position unfilled.

15      But there's a couple -- let's step back a minute.  I mean,

16  first of all, this hiring has nothing to do with Mr. Smith's

17  employment.  It's not an adverse action toward Mr. Smith.

18          **THE COURT:**  Well, I think they're using all of these

19  examples to show that she had racial animus.

20          **MR. PELTON:**  Well, all of these examples are, too.

21  One's this NICU or Neonatal Intensive Care Unit which, I mean,

22  what did she do wrong?  There's no evidence here she did

23  anything wrong.  She handled it.  Followed his recommendations.

24  There were others who had made the same recommendation

25  Mr. Smith did and it was two years earlier.  What does that

1    have to do with race in terms of Ms. Gavulic's animus, or,

2    motives, or, mindset?

3        Dennings, again, it has nothing to do with him, but still

4    there's no decision here.  They couldn't come to a decision.

5    She withdrew.  She has non-discriminatory reasons, solid

6    reasons not to have hired her.  And they say, "Well, it was an

7    employment position."  But the job description, itself, says it

8    requires considerable knowledge of healthcare regulations.

9        Mr. Smith, himself, admitted that at least 20 percent of

10   the job would require non-employment stuff.  And then she had

11   other issues where the interview, obviously, did not go well.

12   These are non- discriminatory reasons what's suggestive of

13   race, in any event.  Why is that a pretext?

14       And so I don't know how that candidate -- these events

15   eight months earlier had anything to do with proving she had a

16   racial animus against Smith, or, active with a racial animus

17   against Smith.  There's no pretext in any of that.

18       He also testified that, "Well, he felt like he was left

19   out of meetings."  But when challenged on that, he couldn't

20   point to one meeting that he was left out of.  And Ms. Gavulic

21   was able to research it and find records that established he

22   attended more one-on-one meetings with her than anyone else and

23   that he was invited to all of the executive group meetings and

24   attended 15 of 17 of those.  It's undisputed, Fact 27.  He

25   couldn't provide any specific examples.  And that's all they've

1  got.

2      I mean, where is -- how does that show pretext for

3  discrimination?  How does that even begin to show that

4  Ms. Gavulic was acting out of a racial motive?  She's got solid

5  reasons.  When a CEO and the General Counsel can't get along,

6  don't have a trusting relationship and it's a growing problem,

7  and the rest of her staff recognizes it, Paragraph 8 of her

8  affidavit, uncontested then, of course, the CEO has a right to

9  terminate it.  And as Mr. Walker had found, he viewed it as

10  workplace disputes.  That Mr. Smith was chasing ghosts.

11      So, when you wrap all of that together, on this record,

12  there's nothing to paint Ms. Gavulic as having racial animus.

13          **THE COURT:**  Okay.  Thank you.

14        **MR. PELTON:**  All right.  On the First Amendment, we

15  haven't covered yet, but again, there's three elements to this.

16  He can't meet those elements.  First, he was not engaged in

17  constitutionally protected speech.  And again, as to Gavulic,

18  she didn't know he was complaining of race.  And as to The

19  Board, he admits The Board wasn't motivated through a

20  retaliatory motive.

21      If the Court cares to hear more about Garcetti, or

22  Scarbrough, or Keeling or Lane?

23          **THE COURT:**  Well, no, it's really Lane that I'm

24  focused on.  And I guess I do have a question, I don't want to

25  get off on a tangent that you-all haven't raised, but more for

1   my future education.

2        Given Hurley's unique posture here as a public entity,

3   could you-all have raised qualified immunity as a defense?

4        **MR. PELTON:**  We did.  We raised it in our affirmative

5   defenses.  It, perhaps, applies.  And particularly it would

6   apply potentially if the Court finds, from our earlier

7   discussion, that the law is ambiguous on this point of to

8   whether a non-decision maker can be held liable and if that's

9   the case, then qualified immunity might come into play because

10  it's not clear what the law is on that.

11       There's actually a Fifth Circuit case that, under similar

12  circumstances, which says, in Fifth Circuit, this law is a

13  little unclear, it's Culbertson v Lykos, 790 F.3d 608.  And

14  there they say qualified immunity protects officials from

15  liability where conduct does not violate clearly established

16  statutory or Constitutional Rights.

17       **THE COURT:**  Oh, no, I'm well aware of the standard.

18  But you didn't raise it, that's why I was curious whether it

19  was something in this context you could.

20       **MR. PELTON:**  Well, I didn't raise it because I don't

21  think there's a dispute as to what the law should be.  But I'm

22  saying if the Court finds the law is ambiguous on this point,

23  as the Culbertson Court did in the Fifth Circuit, they said

24  given that the law is unsettled, then immunity applies.  So, I

25  throw that out there.

1     But I don't think we have to get there because what he

2  engaged in isn't protective speech.  He's engaged in what his

3  job duties require him to do is to keep The Board advised of

4  risks.

5          **THE COURT:**  But they challenge on it, they say that

6  to make a claim of harassment, discrimination, is not within

7  the confines of his job duty and that's their position.

8          **MR. PELTON:**  They say that, without any support

9  whatsoever.  He doesn't testify to that.  His testimony is, "I

10  have an obligation to bring risks to The Board.  To mitigate

11  those risks--"

12          **THE COURT:**  Well, they said there's nothing in his

13  written job description.

14          **MR. PELTON:**  And that's the only thing they point to.

15  So, here's the thing, we come forward with evidence that, as

16  General Counsel, it's his obligation to address discrimination

17  with The Board, especially if it concerns the CEO of the

18  organization, my goodness.

19      And Gavulic testified that his duties included reporting

20  race discrimination complaints, Paragraph 4 of her affidavit.

21  He never denies that.  He does not come forward with any

22  evidence, any testimony, any affidavits saying that's not true.

23  And it defies commonsense.

24      Now, if you look at his job description, and that's the

25  only thing they point to, that's the only piece of evidence, it

1   says it's his job to advise The Board on legal issues.  All

2   legal issues.  To attend and advise The Board on risks.  And,

3   of course, it says at the end, it's only a general description

4   of the nature of the job duties.  Of course, it's his job to

5   tell The Board if the CEO, who reports directly to The Board,

6   is discriminating.

7        Further, there's a policy in place, the Executive Employer

8   Relations Policy, for making complaints.  And he's testified

9   that's what he followed.  Fact 28 admits he was acting pursuant

10  to that policy.  And I think under Keeling, Footnote Three of

11  the Keeling case, if you're acting pursuant to an accepted

12  procedure for employed complaints, that suggests the person is

13  acting pursuant to job duties.  And here, Your Honor, we're

14  talking about the General Counsel and the CEO, of course, he's

15  going to tell The Board about this and will have an obligation

16  to do so.

17       In terms of Lane.  The Court asked about Lane.  You know,

18  it found protected speech where an employee testified to a

19  Grand Jury.  And so he learned some things in the course of his

20  employment, then he goes and testifies pursuant to a subpoena

21  to a Grand Jury.  And the Supreme Court held that that is

22  quintessentially citizen's speech because he's testifying not

23  as part of his job duties, but this outside process.

24       Now, had Smith testified in court regarding the CEO

25  discriminating, whether he'd be protected by Lane would depend

1    on the circumstances.  I think Lane leaves that question open.

2    Perhaps he would be or maybe not.  But those aren't our facts.

3            THE COURT:  No, Lane creates the question that the

4    Court has to determine if the person is acting pursuant to

5    their official duties, not whether they're speaking about

6    something that they've learned in the course of their duties.

7    Are they acting in the course of official duties.

8            MR. PELTON:  Sure, that's Garcetti.  And I don't see

9    a big difference between here and Garcetti.

10        Similarly, with Keeling, you know, they suggest that

11   Keeling got overruled.  I don't think that's true.  If you read

12   Keeling carefully, Keeling goes on and was dicta, but I think

13   would probably run counter to Lane.  But that's just dicta.

14   They're saying, Gosh, if even in these cases someone, I think

15   one of the cases they cited to, the employee is talking to an

16   outside investigator and the lower courts, in that case, found

17   that was part of his job duties.  That kind of thing would be

18   overruled by Lane, I think.

19        But they were saying, Gosh, if it applies in that case, it

20   has to apply here because everything in Keeling was internal.

21   It was a part of her job duties.  The clerk took some people to

22   the public down to talk to the mayor and I suppose that she's

23   retaliated for that.

24        So, I don't think Lane particularly applies to these

25   facts.  I mean, he's not acting outside anywhere of his duties.

1   This is clearly part and partial of his duties.  He's the

2   General Counsel of the whole organization and he's got a CEO

3   who he thinks is discriminating.  And he's acting pursuant to

4   policy.  I believe those facts, which are undisputed, bring

5   this under <u>Garcetti</u> and require Summary Judgment because he's

6   not speaking as a citizen.

7        Again, we've argued that Gavulic couldn't have retaliated

8   because she didn't know Smith complained of discrimination.  I

9   think we've talked about that.  And again, I don't think

10  Walker's memo should be of concern because Walker, himself,

11  testified and it's undisputed that he didn't construe it as a

12  racial complaint, and that's Fact 33.

13       **THE COURT:**  But there's probably, at least, or maybe

14  arguably, a fact issue.  There, he gets the memo and you've got

15  the phrase, "They're harassing.  They're intimidating."  And he

16  throws in, "And by the way, I'm the only African-American

17  executive at the hospital."  Why does he write that if not to

18  at least try to put somebody on notice that he's claiming

19  discrimination?

20       **MR. PELTON:**  Well, again, if you're meeting with the

21  Vice President of HR, who is investigating your complaint, why

22  wouldn't you tell him this is about race discrimination,

23  particularly, when the person you're sitting across from is an

24  African-American?

25       So, while Walker had that, Walker's testimony was

1  undisputed.  He didn't construe it as a racial complaint.  I

2  don't think there's enough there under the <u>Mitan</u> case that we

3  cite.  I told you earlier about <u>Samuel v Correctional Medical</u>

4  <u>Services</u>, Sixth Circuit, 2015 case.  Very, very similar facts,

5  where there's, kind of, this ambiguous complaint about

6  harassment and discrimination, but it's not directly tied to

7  race.  Later they meet with the HR person and never talked to

8  the HR person they think this is about race discrimination.

9      And in any event --

10      **THE COURT:**  And remind me, what was his testimony of

11  why he kept editing out race discrimination?

12      **MR. PELTON:**  His testimony was he didn't want to --

13  he thought if he called it out explicitly, the reader would

14  stop reading because once they see race discrimination, they

15  stopped reading and they have a bad reaction to that.  That was

16  his testimony.

17      He's a smart guy.  He's a 30-year General Counsel.  He

18  asserted that he knew employment law very, very well.  He knew

19  how to make a complaint.  Yet, through all these drafts, he

20  keeps it in until the very last draft and it obscures it.

21      But let me get back to Walker for a minute.  Because what

22  Mr. Walker is conveying to Ms. Gavulic is his view of this and

23  asking her questions about it to have this meeting.  And Walker

24  says, "I didn't construe it as race."  But more importantly,

25  Ms. Gavulic didn't know it was about race.  She never saw that

1  complaint.  Mr. Walker saw it.  She only saw Mr. Walker's

2  summary of it, which is different than the complaint itself.

3     So, I think if we're to apply <u>Mitan</u> and the later Sixth

4  Circuit case, <u>Samuel</u>, you've got to look at what she knew and

5  not what Mr. Walker knew.  And I think it's Facts 29, 31 where

6  Mr. Smith's testimony is cited in terms of him obscuring the

7  facts that he was complaining about race.

8     And again, you've got the non-retaliatory reasons that

9  still stand.  And again, you've got the undisputed Fact 48,

10  that Mr. Smith doesn't believe The Board had a retaliatory

11  animus.  The Board didn't have a retaliatory animus.  He's not

12  going to testify to that.

13     I believe it's appropriate to grant Summary Judgment under

14  the First Amendment Claims, as well as the State Law Claims,

15  and the Whistleblower Claim.

16          **THE COURT:**  Okay.  Thank you.

17     Mr. Freifeld.

18  **RESPONSE BY MR. FREIFELD**

19          **MR. FREIFELD:**  Judge, I'm not exactly, positively

20  sure where you want me to start.  But if you don't mind, I'll

21  start with the State Law Claims and then work my way backwards,

22  if that's all right with you?

23          **THE COURT:**  Yes, that's fine.

24          **MR. FREIFELD:**  All right.  I heard the back and forth

25  about the Whistleblower Protection Act Claim.  And you are

1   absolutely correct that the test for a Whistleblower's

2   Protection Act Claim in the State of Michigan is substantially

3   different than the analysis of a U.S.C. 1983 First Amendment

4   Retaliation Claim, there's no question about that.

5        And here, in order for us to prove our Whistleblower

6   Protection Act Claim -- but by the way, there's also an ELCRA

7   Retaliation Claim, too, retaliation claim under Elliott-Larsen

8   Civil Rights Acts.  Both of those claims have similar methods

9   of truth.  And the prima facie case for both is very similar.

10       Under a WPA Claim, all you have to do is prove that you

11  engaged in protective activity as recognized by the statute,

12  have some type of adverse action happen to you from the

13  employer, and then there has to be proof of causation.

14       The protected activity here is obviously the October 7th,

15  2014 written memorandum, in conjunction with Mr. Smith's

16  testimony about him orally complaining to Mr. Bekofski, the

17  Chairman of the Board of Managers that he was being -- of race

18  discrimination.  And appearing in front of The Board, itself,

19  in November of 2014 and complaining of race discrimination.

20           **THE COURT:**  That's the protected activity, not making

21  internal complaints about your CEO, all right, that's not

22  protected activity, right?

23           **MR. FREIFELD:**  Correct.  The internal complaints

24  about the CEO, about work-related matters, would not be.

25       However, if that internal memo does reference, for the

1   purposes of the Elliott-Larsen Civil Rights Act Retaliation

2   Claim, protected activity, under that statute is, according to

3   McLemore versus Detroit Receiving Hospital, all you have to do

4   is raise the specter of a discrimination complaint.

5          **THE COURT:**  All right.  And where is the evidence

6   that Ms. Gavulic knew that there was -- that Mr. Smith was

7   complaining that she was discriminating against him based on

8   his race?

9          **MR. FREIFELD:**  Well, as I stated in the brief that I

10  -- as I argued in the brief, it was evident that Ms. Gavulic

11  was told that Mr. Smith was complaining of harassing and

12  intimidating behavior.  A reasonable inference from that

13  information would be that she, at that point in time, was put

14  on notice to the effect that something related to race may be

15  the case.

16         **THE COURT:**  Why?

17         **MR. FREIFELD:**  Why?  Because there had been no other

18  reason to believe he was being harassed for any other reason.

19         **THE COURT:**  What if he's a male?  He's old?  He could

20  have made the same arguments there.

21         **MR. FREIFELD:**  That is true.  That is true.  I agree

22  with you on that.

23      But as a reasonable inference from what was told to her,

24  it was brought to her attention that race may have played a

25  factor in what he was complaining about.  At least with -- and

**Response By Mr. Freifeld**
**Wednesday/December 28, 2016**

29

```
 1   as for The Board, itself, I don't think anybody is disputing
 2   here, at least I don't think anybody, that The Board was
 3   clearly aware of what the nature of his complaint was from the
 4   October 7th memo.
 5       And it's clear from Mr. Smith's testimony that The Board
 6   was put on notice that he was complaining.
 7       THE COURT:  And so what's the record evidence -- I'm
 8   going to force you on all of these issues, because one of the
 9   reasons I wanted to have a hearing, I needed a few more
10   specifics from you.
11       What's the specific evidence, in the record, that The
12   Board's action was, in any way, related to the complaint of
13   racial discrimination?
14       MR. FREIFELD:  Bekofski's testimony from his
15   deposition.  And I took his deposition and asked him,
16   specifically, I held up the document, the October 7th, 2014
17   document.  And I asked him, I said:  "Is this what caused him
18   to lose his--", not what caused us to be here today, meaning
19   the deposition or the lawsuit.
20       But if you look at what he actually said in response to my
21   questions, you'll see that I asked him -- he says:  "He gave me
22   this in my office and that's what I was referring to is what I
23   meant about initiating the proceedings that culminate here."
24       Then I asked him the question:  "And the proceedings
25   you're saying culminate here, is the proceeding known as his
```

1   termination.  Do you believe that initiated the need for

2   Mr. Smith's termination?

3         Answer:  Yes."

4             **THE COURT:**  What's the, "That"?

5             **MR. FREIFELD:**  Because he's referring to the, "That"?

6             **THE COURT:**  Yes, what's the, "That"?

7             **MR. FREIFELD:**  That is the document, if you look

8   previously at his testimony, that is the October 7th, 2014

9   document.

10             **THE COURT:**  Right, and I understand.  But my question

11   is, because some of that document is just internal complaints

12   about the CEO that I think we all agree is not protected

13   activity.

14             **MR. FREIFELD:**  But some of that document does make

15   reference to race.  The biggest thing makes reference to race

16   is in the document where it says, "I am the only black

17   executive on the team."  That would lead one to believe, using

18   a reasonable inference, that he is making a specific reference

19   to his own race.

20             **THE COURT:**  Okay.  Stop there.  What is the evidence

21   that this Hurley Board, if I were to say, We're going to have a

22   trial and you're going to bring in these Hurley Board Members,

23   and they're going to tell a jury that the reason they decided

24   to terminate Mr. Smith was because he was complaining -- or, a

25   motivating factor is, because he was complaining about race

1    discrimination?

2          **MR. FREIFELD:**  Correct.  And that's going to come

3    from Mr. Bekofski.  When I asked Mr. Bekofski on

4    cross-examination, "Is it not true that you told me, under oath

5    already, that the reason why this whole need for the

6    termination was because of what he wrote on October 7th, 2014?"

7          His answer, unless he's going to lie, can only be, "Yes".

8          **THE COURT:**  But you don't have to narrow it to the

9    protected activity?

10          **MR. FREIFELD:**  Well, I'm referencing the October 7th,

11   is he going to parse out for me the parts that caused him to

12   come to that conclusion?

13          **THE COURT:**  But it's 99 percent non-protected

14   activity, right?  And maybe one percent potentially protected

15   activity?

16          **MR. FREIFELD:**  I would disagree.  I would say that

17   the parts of the complaint, itself, that would lead one to

18   believe that it was a race discrimination complaint would be as

19   follows:  His reference to the NICU, which was clearly a

20   race-related incident involving the hospital, which Mr. Smith

21   testified felt that Ms. Gavulic handled very poorly and was

22   evidence of potential racial animus on her part.

23          **THE COURT:**  Because that was my other main question,

24   I do not understand that.  I see the father that said, "I don't

25   want an African-American nurse to treat my child", has racial

1    animus.  I don't understand, where is the Gavulic?

2        **MR. FREIFELD:**  It's not the incident itself, it's the

3    way Gavulic dealt with the incident, that's the reason why he

4    believes it's evidence of racial animus.

5        **THE COURT:**  And how did she deal with it that

6    evidences racial animus?

7        **MR. FREIFELD:**  In his mind, it's because she didn't

8    really deal with it very well.  That she basically poo-pooed

9    it.  She felt as though that it was nothing.  That it was a

10   molehill as opposed to a mountain.

11       **THE COURT:**  Did she tell nurses, "You cater to the

12   family?  Let's reassign everybody?"  What did she do?

13       **MR. FREIFELD:**  Well, according to Mr. Smith, she

14   didn't do very much of anything.  If anything -- because

15   Mr. Smith is going to testify that her lack of -- the fact that

16   she did nothing or next to nothing to help solve the problem,

17   initially, and to nip it in the bud early, is evidence that she

18   did not care.  And that, in his mind, was evidence of her own

19   racial animus.

20       **THE COURT:**  What does he think she should have done?

21   What was she to do that the General Counsel thinks she should

22   have done?

23       **MR. FREIFELD:**  What she should have done is

24   immediately gone to the nurse who was involved, Tonya Battle,

25   and immediately went to her and apologized for what had

 1    happened to ease her emotional reaction to the whole event.

 2    Because she did not do that, Bill felt as though she was acting

 3    extremely insensitive to the situation and that insensitivity,

 4    in his mind, translated into some type of racial animus on her

 5    part.

 6            **MR. PELTON:**  Your Honor, I just want to object.  We

 7    do have a protective order in place on this case about

 8    confidential attorney-client privileged communication between

 9    Mr. Smith and Ms. Gavulic and I want to caution we not get into

10    those.

11            **MR. FREIFELD:**  I'm responding to your questions, Your

12    Honors, and this is the response that's going to be elicited.

13        As you said, if we're going to have a trial here, I'm

14    going to tell you what Bill's going to say.  That's what Bill's

15    going to say.  How do I know?  Because I've listened to it many

16    times.

17            **MR. PELTON:**  But you can't --

18            **THE COURT:**  It's not part of the record, is that the

19    representation?

20            **MR. PELTON:**  Well, it is, but it's getting close to

21    what's --

22            **MR. FREIFELD:**  It is and it isn't.  They may say that

23    it's not part of the record.  But as far as I'm concerned, you

24    asked the question, "What is he going to say?"  Or what part of

25    --

1          **THE COURT:**  No, my issue isn't what he's -- I mean, I

2     did ask you what he's going to say.  But I'm trying to get a

3     sense of what's in the record that demonstrate that Ms. Gavulic

4     had racial animus because of this NICU incident?

5          **MR. FREIFELD:**  And that's what I just explained to

6     you.

7          The other piece of evidence that would lead one to believe

8     this October 7, 2014 document was a complaint of race

9     discrimination is obviously the Dennings issue.

10          Now, your question to me is going to be, "Well, how is

11     that evidence of race discrimination?"  That's evidence of race

12     discrimination because Bill Smith wanted to hire Terri

13     Dennings.  Terri Dennings was African-American.  There were no

14     other African-American candidates for this position.  This is

15     the person that he wanted to hire.  This is the person that he

16     vetted.  This is the person he felt was most qualified,

17     compared to the other gentlemen who were taken into

18     consideration and he was told, "No."

19          **THE COURT:**  So, your position, if Hurley Hospital

20     doesn't hire an African-American, they're getting sued for race

21     discrimination because the General Counsel wanted to hire an

22     African-American?

23          **MR. FREIFELD:**  No, that is not my position.  My

24     position is of all the people in that hospital who was

25     eminently qualified to determine whether or not a lawyer could

1  do a job as described in the job description for a staff

2  attorney, there was only one person in that hospital who could

3  have figured that out and that was Bill Smith.  Why?  Because

4  Bill Smith, himself, had been doing that job for 30 years.

5          THE COURT:  And she withdrew.  What are they supposed

6  to do?

7          MR. FREIFELD:  Well, she eventually withdrew, but

8  Bill wanted to hire her.  Now, I'm not exactly, positively sure

9  if the record is clear when that withdrawal happened, so, it's

10  difficult to determine whether or not the withdrawal --

11          THE COURT:  So, you've got the General Counsel

12  decides he wants to hire somebody.  The CEO interviews that

13  person, who also has some skills, some intelligence, and have

14  some concern, I think rightly, that, "I have a candidate that

15  knows nothing about Stark Law.  Maybe that doesn't bother my

16  General Counsel.  I happen to think that somebody in the

17  General Counsel's Office, of a major hospital, should have some

18  knowledge of Stark Law.  It troubles me that she doesn't.  It

19  troubles me that she's got some concern about what the hours

20  would be."  That if she expresses that, it's evidence of racial

21  animus?

22          MR. FREIFELD:  Well, that's a nice argument in front

23  of a jury.  But for the purposes of what we're here doing here

24  today, we're here not to determine whether or not -- we're not

25  supposed to waive this evidence in any way, shape, or form.

**Response By Mr. Freifeld**
**Wednesday/December 28, 2016**

36

1  We're supposed take the evidence at face value and look at it

2  in the light most favorable to the plaintiff.

3        **THE COURT:**  But all I see you saying is you've got an

4  African-American General Counsel wanted to hire an

5  African-American lawyer.  There was some resistance.  The

6  African-American lawyer withdrew and I'm not seeing what's the

7  evidence of racial animus that would make this different in any

8  other scenario?

9        **MR. FREIFELD:**  Well, this is what he put in his

10  complaint to let The Board know that he felt as though the CEO

11  had some type of racial animus.  This is -- you're asking me,

12  "Well, how did The Board know from this document, to the

13  October 7, 2014 document, that racial -- that he was talking

14  about race?"  The NICU incident.  Everybody on that Board knew

15  about the NICU incident.  Everybody in the country knew about

16  the NICU incident, so, there's no question there that they must

17  have thought that race played something in that issue.

18      Number two, the Dennings' matter clearly involved an issue

19  of race because the candidate in question was African-American.

20  He mentions in the complaint that, "I'm the only

21  African-American executive level employee."  So, a reasonable

22  inference that could be drawn from those facts, taken together

23  as the totality of the circumstances, would lead one to believe

24  that The Board was put on notice that race had something to do

25  with what he's talking about in the October 7th, 2014 memo.

1       Now, at trial, Defense counsel can get up and can argue:

2   NICU had nothing to do with race.  Dennings had nothing to do

3   with race.  And the fact that he's the only executive who is

4   African-American, that may bring up the specter of race.  But

5   so what, in the grand scheme of things?

6       But for today's purposes, all we have to demonstrate is

7   that there's a genuine issue of material fact as to whether or

8   not The Board knew or should have known that that document,

9   that October 7th, 2014 document, was a race discrimination

10  complaint.  And the facts in the light most favorable to the

11  plaintiff demonstrates that it was.  And that coupled with the

12  statements, the testimony -- and I know you parsed out the

13  testimony itself.  Then we have the testimony about him

14  addressing The Board in November of 2014, specifically talking

15  to them about race.  That, in itself, will be protected

16  activity.

17      But it's clear from Bekofski here, it's clear from

18  Bekofski here, that this October, 2014 memo, with the

19  references to the racial, two racial incidents, and his own

20  race, would have definitely caused or had something to do with

21  his termination.  It's no -- it's clear as -- I mean, you can't

22  describe it any other way.

23      Now, what are other Board members going to do?  Other

24  Board members are going to come forward and say, "Yes", they

25  were aware of the complaint.  Whether or not they are going to

1    say -- say the fact or the reason he was terminated, what,

2    month and a half or maybe two months after that complaint was

3    filed?

4         **THE COURT:**  Well, he admits it.  He admits there's no

5    retaliatory animus by the majority of The Board.

6         **MR. FREIFELD:**  But what about Bekofski's testimony?

7    That conflicts with Bekofski's testimony.  Whether he has

8    animus is one thing, but there's no question, from what

9    Bekofski states in here that the October 7th complaint had

10   something.  Initiated the process.

11        **THE COURT:**  So, that might matter on one of the

12   claims that doesn't have a, "But for", ELCRA is a little less

13   clear as to what the standard is.

14        **MR. FREIFELD:**  That's true, I'll give you that.

15        But I will tell you that the Michigan Supreme Court in

16   Debano-Griffin versus Lake, gives a -- is the most recent case

17   as to what the causation test is for the purposes of a

18   Whistleblowers' Protection Act Claim and I think we've

19   satisfied that test.

20        And if we've created a fact question on causation for that

21   claim, we've created a fact question for the ELCRA retaliation

22   claim.  So, for the purposes of those two claims, those should

23   be going to the jury to be tried to the jury.

24        **THE COURT:**  Well, if ELCRA is a "but for" cause and

25   you've got the Plaintiff acknowledging, "I don't have evidence

1    of retaliatory animus by the other Board members", isn't that a

2    distinction between the two claims?

3            **MR. FREIFELD:**  Yeah, but for the ELCRA Retaliation

4    Claim, under the Elliott-Larsen Civil Rights Act, the

5    retaliation claim, the causation is almost virtually identical

6    to the causation test for a WPA claim.  And it is not, "but

7    for".  We've not developed that test.  It just has to be one

8    motivating factor in the decision to terminate.

9            **THE COURT:**  And what's the best case that says that?

10           **MR. FREIFELD:**  For the ELCRA Claim?

11           **THE COURT:**  For the ELCRA Claim.

12           **MR. FREIFELD:**  Well, Debano-Griffin, obviously, is

13   the WPA and that has no mention of, "but for".  And as for the

14   ELCRA Claim, I would look at Garg versus Macomb County Mental

15   Health Services and McLemore versus Detroit Receiving Hospital

16   and you'll see that it's not, "but for", it's a motivating

17   factor.

18       If you look at the jury instruction for causation for an

19   ELCRA Retaliation Claim, it's not "but for", it's a motivating

20   factor.  That's what we use in Michigan for those two State Law

21   Claims.  So, I believe that those two State Law Claims should

22   definitely be going to the jury.

23       Now, as for -- let's talk about the Race Discrimination

24   Claim.  On the Race Discrimination Claim, can a recommendation

25   be an adverse action?  I analogize it to the Haji case.  I know

1    the Haji case, it's a First Amendment Claim.  But I didn't

2    think after reviewing the cases that were provided by the

3    Defendant, that they were exactly on point.  There is

4    differences.

5         The Edmund's case.  Judge Edmund's case, I didn't think,

6    really mentioned or really got specifically to the point

7    whether a recommendation for termination constitutes an adverse

8    employment action for the purposes of U.S. 1983 Equal

9    Protection Claim.

10        In fact, the case -- Judge Edmund's case was an ELCRA

11   Claim and that's how she came to a conclusion under ELCRA that

12   a recommendation for termination could not constitute an

13   adverse employment action.

14             THE COURT:  On the -- because I actually want to

15   fast-forward you.  I'm a little more focused on pretext and

16   you've addressed the NICU.  You've addressed the Dennings.

17   What are the specific meetings that Mr. Smith was excluded

18   from?

19             MR. FREIFELD:  Mr. Smith claims that there were

20   several meetings for executives that he was excluded from,

21   despite the fact that he couldn't specifically identify those

22   meetings in his deposition testimony.  He claims there were

23   several meetings he was excluded from or not told about that

24   the other executives were.  And he felt as though that was done

25   on purpose.

1           THE COURT:  Are you able to identify any?

2           MR. FREIFELD:  Any specific meetings?  Actually,

3    date, time, place?  No, I cannot do that.  I'm sorry.

4           THE COURT:  Did anybody else testify?  Any other

5    executive, that they were in a meeting that Mr. Smith was

6    excluded from?

7           MR. FREIFELD:  In this case, no other executives were

8    deposed, so, I can't answer that question.

9        So, what we have, for the purposes of pretext, is his

10   testimony about being excluded from meetings, the Dennings

11   issue, and the NICU issue.  So, that would be his evidence of

12   pretext demonstrating racial animus.

13       The First Amendment Claim.  Whether or not his speech is

14   protected activity is an interesting question.  The question is

15   Lane.  Lane versus Franks.  And there is a case that I didn't

16   cite in my brief, but I'll mention to you right now.  It's

17   Larry versus Powerski, 148 Fed. Sub 3.d 584.  And it was

18   decided in 2015 by Judge Lawson.  And there's a similar, and

19   I'll tell you why it's similar, because the same -- because

20   that also involved Hurley, believe it or not.

21       And in that case, Hurley argued that Ms. Larry did not use

22   their policy to make race discrimination claims that were

23   happening to her as a result of what her supervisor was doing

24   to her.  And in that case, Judge Lawson addressed Lane and

25   addressed Lane in the context of that argument that Hurley made

1    in that case and he states the following on Page 600:

2        "It would be unusual and contrary to the very core of the

3    First Amendment to conclude, as the Defendant urges, that a

4    public employee surrenders her First Amendment protection any

5    time she complains of unlawful activity, no matter how ambitus,

6    merely because an employer has a workplace policy that

7    encourages or require employees to report such conduct."

8        And that -- she's utilized -- and how he came to that

9    conclusion on Page 600 is he utilized the logic of Lane versus

10   Franks, to determine that in that case, Ms. Larry engaged in

11   protected activity for the purposes of the First Amendment.

12           THE COURT:  She was not acting pursuant to her

13   employment duties?

14           MR. FREIFELD:  That's correct, she was not acting --

15           THE COURT:  And Mr. Smith writes in his memo, quote,

16   "As a result, I am left with no option but to officially

17   request, to officially request, implementation of the executive

18   employee relations policy.  Specifically Page 2, Section 2,

19   Vice Presidents reporting directly to the CEO, second and third

20   paragraphs which reads in pertinent part, 'If the concern

21   involves the CEO, the VP may bring the concern to the attention

22   of the VP for Human Resources, or, the Chair of the Board of

23   Managers'," end quote.

24       How can there be a fact issue that he was not writing this

25   memo in official capacity, but instead, was just acting in a

1    pure citizen's capacity?

2         **MR. FREIFELD:**  Because he's complaining about racial

3    discrimination against himself as opposed to anything else.

4         **THE COURT:**  Pursuant to official company policy,

5    given his position and given Ms. Gavulic's position, right?

6         **MR. FREIFELD:**  I don't know -- I haven't seen

7    anything in writing.  Anything.  And Hurley has not produced

8    anything in writing that specifically states that under these

9    circumstances Bill Smith, if he had a racial discrimination

10   claim against himself, by his supervisor, that was part of his

11   duties and responsibilities to bring that to the attention of

12   anyone.

13       The policy specifically states, "Workplace Policies,

14   Workplace Problems."  It does not specifically make reference

15   to race discrimination complaints or any discrimination

16   complaint, for that matter.  Whether it be age, or sex, or what

17   have you.  That was not part and partial of that policy.

18        **THE COURT:**  So, that would not be within the General

19   Counsel's duties because it's not written in there?  You're

20   saying the General Counsel would not know that he has an

21   obligation to report discrimination, if he's aware of it?

22        **MR. FREIFELD:**  Against himself or against others?

23   That's the question.  And you're going to say, "Well, does it

24   matter?"  Yes, it does.  As it pertains to other people?

25   Absolutely.  As it pertains to himself?  That's not clear.

Response By Mr. Freifeld
Wednesday/December 28, 2016                              44

1    That's not clear.  If it pertains to others, "Yes"; if it

2    pertains to himself, that's just not clear.

3         And another thing I would say is --

4         **THE COURT:**  Good thing they didn't raise qualified

5    immunity, right?  You're, kind of, glad?  This would be a hard

6    issue on qualified immunity, would it not?

7         **MR. FREIFELD:**  I would.  I would agree with that.

8         Also, if you look at Larry versus Powerski, which I just

9    read to you, Judge Lawson also addresses the issue of when

10   qualified immunity is not raised in briefs or in reply briefs,

11   it's considered abandoned.  So, for the purposes of what we're

12   talking, I would say that qualified immunity is abandoned.

13   Even though they raised it as an affirmative defense, it should

14   be considered abandoned for the purposes of this case.

15        With that being said, I would ask:  Would also his

16   addressing The Board in November of 2014, would that also --

17   when he verbally tells them in front of them at the meeting --

18   is that also not considered protected activity under the First

19   Amendment?  Is he doing that as part of his official duties and

20   responsibilities where he's complaining to them about race

21   discrimination against himself at an official board meeting?

22        I can understand reading Keeling versus Coffee.  I

23   understand where they're coming from, although it's factually

24   different from this case.  In Keeling, she was complaining

25   about a supervisor who was not servicing the public.  There's

1   no mention of her complaining about sex discrimination, age

2   discrimination, any of those things.

3       But my question would be, even if that's the case, is what

4   he's telling The Board in November of 2014, when he's

5   addressing them in November, 2014, is that also not considered

6   protected activity under the First Amendment?  Is that part of

7   his official duties is to go before The Board, stand before

8   them and say, "I'm being discriminated against because of my

9   race"?  I don't think so.

10      **THE COURT:**  What about to lay out the entirety of his

11  complaints against the CEO?  That's what he has done here.

12  He's saying, "I have an issue with the CEO.  And, we, at the

13  hospital"--, it appears, you have a policy if your complaints

14  involve the CEO because maybe you don't have to take your

15  complaints about the CEO to the CEO, you can go elsewhere.  So,

16  I've got a 12-page, single-spaced memo that I would like to

17  submit that sets out some issues with the Hurley CEO pursuant

18  to the Hurley Policy and I'm the Hurley General Counsel.

19      **MR. FREIFELD:**  Right.  And that, coupled with the

20  fact that he testified that in November of 2014 he went before

21  them, with his complaint, explained to them all those things

22  and then said to them, according to his testimony, "Oh, by the

23  way, I'm also being discriminated against because of my race."

24      How is that also not considered protected activity under

25  the First Amendment?  Race discrimination complaints always

 1    touch on a matter of public concern.  But that's one issue.

 2    Whether or not he's a citizen while he's doing it, clearly

 3    under <u>Lane versus Franks</u>, he's supposed to go before The Board

 4    at a board meeting and tell them he's being discriminated

 5    against because of his race?  Where in <u>Lane</u> does it say that

 6    anywhere?  It doesn't say that anywhere.

 7         I mean, what Hurley expects Bill Smith to do here, in

 8    order to be considered a citizen, for the purposes of a First

 9    Amendment Claim, is Bill Smith would have to come before The

10    Board of Managers, on a day off, not in a suit and tie.  Get

11    before them and tell them, "I need to talk to you about

12    something", and tell them he's being discriminated against

13    because of his race.

14         That seems a bit extreme, in light of the case law,

15    especially in a proper reading of <u>Lane versus Franks</u>.

16         **THE COURT:**  Well, you tell me, what does it mean when

17    he says, "I officially request implementation of the policy"?

18    Officially request, seems, to me, to say, "In my official

19    capacity."

20         **MR. FREIFELD:**  He's invoking the policy so that he

21    can -- he's invoking the policy for the purposes of bringing it

22    to the Board's attention.  So, he's going through the Chairman.

23    He's bypassing -- actually, his real supervisor is not The

24    Board, it's her.  What he's doing is he's invoking this policy

25    so that he could bypass her and go to the Chairman of Board

1   with his issues.  That's what he's using this for.

2       Not for the purpose --

3           THE COURT:  And if he is just an ordinary citizen,

4   would he be able to do that?

5           MR. FREIFELD:  I would imagine any -- because it's a

6   public body, any ordinary citizen will be able to address the

7   body at any point in time.  So, whether he could do that --

8   actually, what he did in November of 2014, by addressing The

9   Board on the day that he did and where he testified that he was

10  complaining of race, any citizen could do that.  Any citizen of

11  the City of Flint could address them.  Or, for that matter,

12  Genesee County, could have done the very exact same thing.  Not

13  necessarily about things that are happening in the hospital,

14  but they could do that.  And any employee could do that, I

15  would imagine.  I would hope that any employee could be able to

16  do that.

17          THE COURT:  Okay.

18          MR. FREIFELD:  I addressed the issue of her knowledge

19  about certain issues.

20      On the Scarbrough case, whether The Board -- the

21  significant block, as I stated in my brief, I thought the

22  significant block argument that was brought up by Defendant, in

23  this case, was defeated by Scarbrough.  Scarbrough says that's

24  not the case.

25      It's always "but for".  It always will be "but for".  You

1    don't have to the show majority.  You don't have to show

2    certain members went a certain way, at least for the purposes

3    of the First Amendment, you just have to show "but for"

4    causation in those cases.  I just never -- it just didn't

5    seemed to be a fair reading of <u>Scarbrough</u> indicated that their

6    significant block defense was still viable or is even

7    considered viable in the Sixth Circuit.

8         So, I would say that it demonstrates that there was

9    causation for the purposes of the First Amendment Claim, for

10   the Board, and to the hospital in its entirety.

11        If you have any other questions, Your Honor?

12             **THE COURT:**  No, I do not.  Thank you.

13        Mr. Pelton, anything further?

14   **RESPONSE BY MR. PELTON**

15             **MR. PELTON:**  On the WPA Claim.  I think we addressed

16   this, but again, I want to make sure that the Court's clear.

17   Even if it's there's a prima facie case, they still have to

18   ultimately carry their burden and they don't do that here.  And

19   I'm not even conceding it's a prima facie case because as part

20   of that, they have to establish a causal connection.

21        Now, Mr. Bekofski's testimony.  Again, I would request the

22   Court to look carefully at Pages 16 and 20 to 21, because he

23   says there were intervening events that caused him to vote in

24   favor of the resolution to terminate because there's

25   irreconcilable differences.  I don't see any evidence

1    overcoming that and that's only one board member.

2        I also, in terms of should Scarbrough apply to these

3    Michigan Law issues?  There is, it appears to me now sitting

4    here, a recent Michigan Supreme Court.  And I can't come up

5    with the name of it.  It was in the last couple of months that

6    articulated a "but for" standard.  And I don't recall, Your

7    Honor, if that's retaliation or not, but I think it's worth a

8    look.

9        But again, there's still no, if we get passed the prima

10   facie stage, there's really nothing to suggest there's an

11   impermissible motive here.  And you couple it with his

12   admissions that there's a -- he didn't believe anyone on The

13   Board had a retaliatory animus.

14       On the Dennings issue.  I don't think Dennings would have

15   a case under Michigan Law, if you look at Hazel v. Ford and

16   other many Michigan Supreme Court cases.  Dennings wouldn't

17   have a case, let alone Mr. Smith having a case based on what

18   happened to her.

19       And then finally on this issue of citizen speech under the

20   First Amendment.  Of course, race is a matter of public

21   concern.  We haven't contested that and we shouldn't confuse it

22   with whether it's citizen speech.  Now, I believe Mr. Freifeld

23   just admitted that if it's against others, if the

24   discrimination by a CEO is against others in the organization,

25   he would, his words, "Absolutely have a duty to report."

1     Well, if it's about himself, then it's even more personal

2   and less about citizen's speech, it would seem to me.  And I

3   don't understand why there would be any difference there

4   because the issue he's obligated to raise with The Board is

5   that you have a CEO who's behaving badly, that's the issue.

6   And The Board --

7          **THE COURT:**  What if, under <u>Lane</u>, if Mr. Smith went to

8   an open meeting, the monthly open meeting of The Hurley Board

9   and:  Anything else anyone wants to discuss?  And I raise my

10  hand and Mr. Smith goes to the podium and:  Ladies and

11  gentlemen of The Board, I'd just like to bring to your

12  attention some concerns I have.  I'm a lifelong resident here.

13  I also work for the hospital, but I've got concerns about

14  discrimination involving others.  Involving me.

15     Would he lose his First Amendment protection there under

16  <u>Lane</u>?  Would he be acting in the scope of his official duties

17  or would he be communicating as a public citizen?

18          **MR. PELTON:**  Well, I don't know the answer to that.

19  I think it would be a very, very close question and would

20  require a lot of study.  Those aren't our facts.  What he did

21  was an executive session.  And that means in a private session

22  where he could convey to The Board and talk to The Board and

23  potentially even talk to them in a privilege -- attorney-client

24  privilege setting.

25     If you --

 1        **THE COURT:**  I think it's as an extension the

 2   Plaintiffs are saying, when it's about himself, when he's

 3   complaining about himself being discriminated against, not his

 4   fellow employees or patients, that he's the General Counsel

 5   responsible for.  When it's about him, he's speaking as a

 6   citizen, not as the General Counsel.

 7        **MR. PELTON:**  But he's utilizing, again, the internal

 8   procedures of the company to pursue that, number one.

 9        Number two, it is partial to his obligation as the General

10   Counsel of the entity to bring this to The Board's attention.

11   And he does so and he does so pursuant to a policy.  And as the

12   Court pointed out it's about a lot of issues, not just race.

13   He had an obligation to bring this to The Board.

14        Were he the Chief Medical Officer?  That may not apply.

15   But he's the General Counsel.  It's part and partial to his

16   duty.  And that's why this is much more like Garcetti, than it

17   is Lane.  And much more like Keeling than it is Lane.

18        **THE COURT:**  Okay.  Thank you.

19        A lot of interesting issues and I appreciate that you-all

20   are willing to engage and answer all of the questions.  But

21   there are still some issues that I wish to wrestle with, so,

22   I'm not going to issue a ruling today.  I am going to take the

23   motion under advisement and I'll be issuing a written opinion

24   and order.

25        Thank you-all.  Have a good holiday.  Happy New Year.

**Response By Mr. Pelton**
**Wednesday/December 28, 2016**                    52

1              (Whereupon proceedings concluded at 3:07 p.m.)

2                          -       -       -

1

2

3                        -   -   -

4              C E R T I F I C A T I O N

5          I, Nefertiti A. Matthews, official court reporter

6      for the United States District Court, Eastern District of

7      Michigan, Southern Division, appointed pursuant to the

8      provisions of Title 28, United States Code, Section 753,

9      do hereby certify that the foregoing is a correct

10     transcript of the proceedings in the above-entitled cause

11     on the date hereinbefore set forth.

12         I do further certify that the foregoing

13     transcript has been prepared by me or under my direction.

14

15     Date: February 7, 2017

16

17     s:/Nefertiti A. Matthews
       Nefertiti A. Matthews,
18     Official Court Reporter

19                        -   -   -

20

21

22

23

24

25